United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 3, 2003**

Charles R. Fulbruge III
Clerk

Revised November 13, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 02-50721
_____


JOSE C. DEHOYOS; EVA PEREZ-DEHOYOS;
GEORGIA HARRISON; CHARLES WHITE;
SHERYL H. FRANKS; MARTEL SHAW,

                              Plaintiffs - Appellees,

v.

ALLSTATE CORPORATION; ALLSTATE
INSURANCE COMPANY; ALLSTATE TEXAS
LLOYD'S; ALLSTATE INDEMNITY COMPANY,

                              Defendants - Appellants.


_____

Appeal from the United States District Court
for the Western District of Texas
_____


Before DAVIS, JONES, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

     This interlocutory appeal presents a preemption question.
Six members of a proposed class of non-Caucasian insurance
customers instigated this Civil Rights action against Appellants
Allstate Insurance Corp. *et alia* (Appellants or Allstate),
alleging that Allstate engages in racially discriminatory
business practices in violation of 42 U.S.C. §§ 1981 and 1982 of
the Civil Rights Act of 1866, and in violation of the Fair
Housing Act (FHA), 42 U.S.C. §3601 *et seq*. Appellants filed a

Rule 12(b)(6) motion to dismiss, arguing that the anti-preemption provision of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), precludes application of federal anti-discrimination laws to the controversy at bar. The district court denied the motion, finding that the application of the civil rights statutes was not precluded by the McCarran-Ferguson Act, but simultaneously granting leave for this interlocutory appeal. We find that the McCarran-Ferguson Act does not bar Appellees' claims, and consequently we affirm the ruling of the district court.

## I.

Appellees are six non-Caucasian Allstate policyholders who instigated this action alleging racially discriminatory pricing practices on the part of Appellants Allstate, *et al.* in violation of 42 U.S.C. §§ 1981 and 1982 of the Civil Rights Act of 1866 and in violation of the FHA, 42 U.S.C. §3601 *et seq*. Specifically, Appellees allege that Allstate uses a "credit-scoring system" to target non-Caucasian customers for the sale of more expensive insurance policies than those directed at Caucasian customers. Similarly, the credit-scoring system is allegedly used to "place" non-Caucasian applicants into more expensive policies than those polices into which Caucasian applicants are placed.[1]

---

[1] The dissent invites us to label Appellees' claims under §§ 1981 and 1982 a diversion and to comment on the merits of those claims. We decline to go beyond the preliminary questions presented by this interlocutory appeal.

Appellees filed a three-count class action complaint. Appellants filed a motion to dismiss, arguing, *inter alia*, that Appellees' claims are preempted by the McCarran-Ferguson Act. The district court denied the motion to dismiss in all regards. However, at the conclusion of its memorandum opinion, the district court noted that the order involved "controlling questions of law as to which there are substantial grounds for difference of opinion." The district court went on to suggest, *sua sponte*, that it would "look favorably upon a properly and timely filed motion for leave to file an interlocutory appeal." Appellants so filed, and that interlocutory interrogatory is now before this Court. *See* 28 U.S.C.A. § 1292. The preemptive effect of the McCarran-Ferguson Act constitutes the sole point of appeal.

## II.

Where, as here, a district court's ruling on a 12(b)(6) motion to dismiss is based entirely on conclusions of law, this Court reviews that determination *de novo*. *See Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993). The sole issue before this Court is whether the McCarran-Ferguson Act precludes the application of §§ 1981 and 1982 of the Civil Rights Act of 1866 and the FHA to the insurance pricing schemes at issue here. The McCarran- Ferguson Act (MFA) provides in pertinent part:

> No Act of Congress shall be construed to
> invalidate, impair, or supersede any law

3

> enacted by any State for the purpose of
> regulating the business of insurance...unless
> such Act specifically relates to the business
> of insurance.[2]

15 U.S.C. § 1012(b).

### A. *Humana Inc. v. Forsyth*

The Supreme Court outlined the framework in which MFA preemption questions are to be addressed in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999). In *Humana*, the Court reviewed whether the application of RICO in an insurance context was preempted by the MFA. In finding that RICO was not preempted by the MFA, the Court expressly rejected the view that the MFA authorized a state-supremacy "field preemption" approach to the application of federal law to the insurance industry. Instead, the Court emphasized that MFA preemption is to be examined within a "conflict preemption" rubric, and that, as such, the analysis will turn on one of two axes: (1) the existence of an express conflict with the letter of the state law; or (2) the frustration of an officially articulated state regulatory goal. Moreover, the Court rejected an implicit presumption against the application of federal law in insurance contexts, stating instead that federal law is to be applied in an insurance context where it can be

---

[2] The Act goes on to expressly exempt the Sherman Act (1890), the Clayton Act (1914), and the Federal Trade Commission Act (1914).

4

applied in harmony with state law.

Additionally, the *Humana* Court found that RICO could be applied in harmony with the state law because, *inter alia*, the federal law did not proscribe conduct that the state insurance laws permit; the existence of different remedial regimes does not constitute an impairment of the state regulatory scheme; the federal law augmented and advanced state regulatory goals; and the federal law did not frustrate a *particular* and *declared* state regulatory policy.

In sum, in extremely clear and specific language the Court identified the following three MFA preemption threshold requirements:(1)the federal law in question must not be specifically directed at insurance regulation; (2) there must exist a particular state law (or declared regulatory policy) enacted for the purpose of regulating insurance; and (3) application of the federal law to the controversy in question must invalidate, impair or supercede that state law.[3]

We have not yet had occasion to pass upon the MFA preemption

---

[3] With similar clarity the *Humana* Court went on to articulate the following MFA "impairment" standard:

> [1] When federal law does not directly conflict with state regulation, and [2] when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

*Id.* at 307, 310.

5

standard outlined by *Humana* within the context of applying § 1981, § 1982, or the FHA. However, this Court did recently consider MFA preemption in the context of the Federal Arbitration Act, 9 U.S.C. § 4 (FAA). In *American Heritage Life Insurance Co. v. Orr*, 294 F.3d 702 (5th Cir. 2002), we reviewed and rejected a challenge to the application of the FAA in an insurance context:

> The test under McCarran-Ferguson is not whether a state has enacted statutes regulating the business of insurance, but whether such state statutes will be invalidated, impaired, or superseded by the application of federal law. *Appellants fail to identify any statute that would be impaired, invalidated, or superseded by the application of the FAA*. Instead, Appellants try to perpetrate a judicial end-run by asserting that an attorney general's opinion or insurance department's regulatory, administrative policy is the functional equivalent of a state law relating to insurance, thereby triggering the provisions of the Act. Appellants' arguments are without merit.

*Id*. at 708. (emphasis added)(internal citations and quotation marks omitted). Thus, in *American Heritage* this Court concluded that MFA preemption would not be found merely because the state has a mechanism in place for regulating insurance contracts, nor could the state's putative disfavor of arbitration in the insurance context serve as a sufficient ground upon which conflict with the FAA could germinate. We found instead that

> [t]he party seeking to avail itself of the [McCarran-Ferguson] Act must demonstrate that application of the FAA would invalidate, impair, or supersede a particular *state law*

6

that regulates the business of insurance.
*Id.* (emphasis in original).

Moreover, several of our sister circuits have passed squarely upon the question of MFA preemption with respect to § 1981, § 1982, or the FHA. Every circuit that has considered the question has determined that federal anti-discrimination laws may be applied in an insurance context, even where the state insurance agencies have mechanisms in place to regulate discriminatory practices. Specifically, the Eleventh, Seventh, Fourth, Sixth, and Ninth Circuits all have determined that the MFA does not prevent the application of federal anti-discrimination laws to the insurance industry.[4]

In *Moore v. Liberty National Life Insurance Co.*, 267 F.3d 1209 (11th Cir. 2001), the Eleventh Circuit considered a

---

[4] *See Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001); *NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287 (7th Cir. 1992); *Mackey v. Nationwide Ins.*, 724 F.2d 419 (4th Cir. 1984) (application of FHA in insurance context would not impair or supersede any state law, although North Carolina forbids discriminatory rates in the insurance business); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995)("We conclude that the presence of additional remedies in the Fair Housing Act does not cause the Act to invalidate, impair or supersede Ohio insurance law. Accordingly, we hold that the McCarran-Ferguson Act does not preclude HUD's interpretation of the Fair Housing Act."); *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50 F.3d 1486, 1491-92 (9th Cir. 1995) (following *American Family* and holding that federal regulation that provides additional remedies to those provided under state insurance plan does not violate MFA).

7

challenge to the application of §§ 1981 and 1982 to allegedly racially discriminatory "red-lining" insurance practices. The Eleventh Circuit upheld the application of the federal anti-discrimination laws despite the fact that Alabama law purportedly implicitly authorized racially discriminatory practices which have an "actuarial basis."  The Eleventh Circuit rejected the contention that allowing the application of federal civil rights statutes would frustrate or interfere with Alabama's policy of allowing discriminatory practices which were based on actuarial reality:

> We are asked to assume that the abolition of one form of discrimination, as codified in section 27-11-12, amounts to a clear declaration by the state that all other forms of discrimination, however invidious, are acceptable. We cannot construe Alabama's scheme of insurance regulation in such a formalistic and narrow way. *Absent more convincing evidence that racial discrimination in the insurance context is an integral part of Alabama's regulatory scheme, Liberty National's argument must fail.*
>      . . . .
>      . . . *[W]e . . . cannot conclude that Alabama intended to condone racial discrimination in its scheme of insurance regulation*. We therefore see no inconsistency between the state's interest in preventing "unfair discrimination" between individuals with similar life expectancies and the paramount national interest in preventing racial discrimination in the contexts articulated by §§ 1981 and 1982. *The two nondiscrimination principles complement each other, and Liberty National has not demonstrated that the federal statutes at issue impinge on any declared state policy in the insurance context*. Therefore, the

8

> McCarran-Ferguson Act does not require the reverse-preemption of plaintiffs' §§ 1981 and 1982 claims.

*Id.* at 1222-23 (emphasis added).

Similarly, in *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287 (7th Cir. 1992), the Seventh Circuit found an FHA challenge to an allegedly racially discriminatory practice of "red-lining" was not barred by MFA preemption. The Seventh Circuit noted that:

> If Wisconsin wants to authorize redlining, it need only say so . . . . American Family has not drawn to our attention, however, any law, regulation, or decision in Wisconsin requiring redlining, condoning that practice, committing to insurers all decisions about redlining, or holding that redlining with discriminatory intent (or disparate impact) does not violate state law . . . . No official of Wisconsin has appeared in this litigation to say that a federal remedy under the Fair Housing Act would frustrate any state policy. Although the McCarran-Ferguson Act gives states the final word on the regulation of insurance unless Congress specifically overrides their choices, Wisconsin's word is consistent with the Fair Housing Act.

*Id.* at 297.

Additionally, the same issues were reached and accord was found in every circuit which has reviewed a MFA preemption challenge to the application of § 1981, § 1982, or the FHA in an insurance context.


B.  *Humana* Standard Applied to the Controversy at Bar

9

Here, all parties agree that the sections of the civil rights statutes under which Appellees seek relief do not "specifically relate to the business of insurance." Therefore, the first *Humana* threshold requirement is met. The resolution of the preemption question then turns on whether the second two prongs can be met: whether there exists a state law or official policy which is directed at the regulation of insurance, and whether application of § 1981, § 1982, and the FHA to the insurance practices at issue here would "impair" that state insurance law. Here, however, Appellants' ability to invoke the MFA preemption fails on both fronts. First, and most importantly, Appellants do not point to any law with which the federal civil rights laws conflict, nor do they direct this Court to any declared regulatory policy which the application of these statutes would frustrate. Moreover, because Appellants do not identify a state law or policy that would be impaired by the application of the federal statutes, it is impossible for them to prevail on the third *Humana* prong, i.e., a finding of impairment caused by the application of the federal law.

The above analysis notwithstanding, Appellants generally contend that the application of federal law to the practices at issues here would impair the state law of Florida and Texas. Under *Humana*, to impair state law, the federal law must either

10

directly conflict with state regulation, frustrate a declared

policy, or interfere with an administrative regime.[5] Appellants

---

[5] Appellants also urge us to entertain two additional theories of preemption. The first argument, dubbed the "filed rate" argument, is presented to us for the first time in this interlocutory appeal. As an initial matter, we observe that we consider issues raised for the first time on appeal "*only* 'in extraordinary instances . . . to avoid a miscarriage of justice.'" *Martinez v. Tex. Dep't of Criminal Justice*, 300 F.3d 567, 573 (5th Cir. 2002)(emphasis in original)(quoting *Doleac v. Michalson*, 264 F.3d 470, 492 (5th Cir. 2001)). Moreover, although we have discretion to review on interlocutory appeal those issues which are "fairly included" in the appeal, we do not deem this argument to be fairly included, as it is, at best, ancillary to Appellants' primary arguments in support of preemption. *See Reserve Mooring Inc. v. Am. Commercial Barge Line LLC*, 251 F.3d 1069 (5th Cir. 2001).

Regardless, however, we find Appellants' "filed rate" argument unpersuasive. The application of anti-discrimination laws cannot reasonably be construed to supplant the specific rate controls of Florida and Texas. The application of the civil rights laws cannot even supplant whatever anti-discrimination components may be inherent or express in the insurance rate controls which Florida and Texas may choose to adopt. If Florida or Texas had adopted a specific rate control law or policy that conflicted with the anti-discrimination policies manifested in the civil rights statutes, those states needed only to direct us to that specific law and we would have obligingly considered the purported conflict.

Here, however, Appellants do not direct this Court to a direct conflict or to a frustrated and *declared* policy with respect to their filed rate argument. Florida and Texas have recently passed laws regulating credit scoring. *See* Act of June 26, 2003, 2003 Fla. Laws ch. 407, § 3 (to be codified at Fla. Stat. ch. 626.9741); Act of June 11, 2003, ch. 206, § 301, 2003 Tex. Sess. Law Serv. 907, 916 (Vernon) (to be codified at Tex. Ins. Code § 21.49-2U); Act of Feb. 25, 2003, ch. 1, § 3, 2003 Tex. Sess. Law Serv. 1, 2 (Vernon) (to be codified at Tex. Ins. Code § 5.141). However, these laws are not retroactive and thus have no bearing on Appellees' cause of action. Consequently, even were we inclined to address this argument for the first time on appeal, we would find it unavailing.

Appellants' "super actuary" argument is similarly flawed. Appellants argue that "if this case were allowed to proceed and the plaintiffs were able to show disparate impact, the district court will be required to . . . substitute its judgment for the judgment of each of the 50 state insurance departments regarding whether the use of credit scoring is appropriate." This

argue that the application of the civil rights statutes at issue here would frustrate Texas and Florida state insurance policy by frustrating the ability of those states to regulate insurance pricing policies. However, in this argument Appellants adopt entirely a "field preemption" posture, declining to direct the Court to a particular law or declared regulatory policy, and instead confining their argument to the observation that states regulate insurance pricing and then vaguely conjecturing that,

construction, although colorful, is incorrect. Appellants' ominous description of the court's role as "super actuary" sitting in judgment on the specific insurance-rate policy preferences of Florida and Texas is fanciful. In engaging in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law, a court would no more become a "super actuary" than the court becomes a "super entrepreneur" each time the court must determine whether a discriminatory practice constitutes a business necessity. Appellants' attempt to distinguish the business of insurance from other businesses is unpersuasive. The business of insurance is distinguishable only in that Congress has protected the business of insurance from inadvertent federal preemption. Thus, our analysis is concerned only with whether the civil rights laws are in harmony with state regulation. We are not dissuaded from our preemption conclusion merely because a court may eventually be required to determine whether the complained-of conduct actually violates federal law.

Thus, if Appellants were to bring a proper motion to dismiss the disparate impact claims under this new theory, and the district court were to decline to dismiss the claims, it would be because the federal regulatory goal of disallowing racially discriminatory insurance pricing is in harmony with the state's goal of disallowing racially discriminatory insurance pricing. While Appellants persist in trying to mold the issues of this appeal into federalism questions, *Humana* makes clear that the field of insurance regulation is not reserved to the states exclusively, that federal law governs concurrently in the area, and that federal law will only be preempted where there is a statutory or policy *conflict*. Therefore, allowing the states to exercise exclusive or autonomous discretion in insurance regulation is not a valid rationale for finding MFA preemption.

12

somehow, "federal civil rights laws will interfere with and frustrate the abilities of states to regulate insurance rate making." [6]

Obviously this assertion is not nearly enough to withstand *Humana* scrutiny. Appellants cannot demonstrate that the federal law in question frustrates a policy associated with the regulation of insurance pricing without identifying an actual policy. Even filling in for Appellants the fact that Florida and Texas might adopt an approach different from the approach embodied in the federal statutes, the mere fact that the two approaches are different is not sufficient to create a conflict.

---

[6] In support of this general impairment argument, Appellants rely heavily on *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999), a case which is entirely inapposite. In *Doe*, there was an actual *state insurance law* which purportedly conflicted with the application of the ADA to the particular insurance question at issue. There, Illinois enacted a law which permitted caps on health care insurance for patients with AIDS. The state insurance law was challenged under the ADA, and the defendants raised a MFA defense. The Seventh Circuit was required to consider whether the state law conflicted with the ADA, because, if it did, then it would be necessary for the court to determine whether application of the ADA to the AIDS-cap question violated the MFA anti-preemption provision. The Seventh Circuit concluded that the state law did not violate the ADA, so no preemption was found.

Here, however, we have no state law which purportedly conflicts with the application of the civil rights statutes to the particular question of credit-scoring. Therefore, obviously, we cannot consider whether the nonexistent law violates the civil rights statutes such that the application of the civil rights statutes could potentially violate the MFA. The problem here, as elsewhere in Appellants' analysis, is that there simply is no state law for us to consider.

13

The approach of the federal statute must tread upon a declared policy goal of the state scheme. Here, as the district court correctly noted, "Defendants have not drawn the court's attention to any law, regulation, or decision in Texas or Florida requiring . . . [or] condoning" the credit-scoring practice at issue here.[7]

Instead, in adopting this view, Appellants and their supporting *amici* have implicitly adopted the position that the *Humana* Court's use of the phrase "or interfere with a State's administrative regime" means that if the state has a mechanism in place for performing an insurance-related function and the federal law enters that regulatory arena, then the federal law is "interfering" with the state's administrative regime. This interpretation, however, is manifestly at odds with both the facts and express holdings of *Humana.* In *Humana*, the Court expressly rejected a "field preemption" approach to MFA preemption, holding instead that federal and state law can concurrently affect the same issues and further the same goals as long as the federal law does not *frustrate* the state's *declared*

---

[7] Appellants argue that disparate impact claims are particularly likely to impair state law. We do not agree, and in any case the conflicts Appellants warn of are entirely conjectural. The dissent reiterates Appellants' argument but offers no more convincing evidence that disparate impact suits will necessarily impair state insurance regulation. We therefore decline to differentiate claims of disparate impact and claims of intentional discrimination at this preliminary stage of litigation.

policy. "Interference," then, is not synonymous with "a presence in the regulatory field." For example, in *Humana*, the Court found that although states have administrative regimes and mechanisms in place to regulate insurance fraud, the question is not whether the state administrative regime has "occupied that field." Instead, the question is whether the regulatory goals are in harmony. RICO, the Court found, supplemented the state's mechanisms for eliminating insurance fraud, and consequently the purpose and goals of both RICO and the state insurance law were in alignment rather than conflict. This line of reasoning clearly demonstrates that the Court has rejected an interpretation of "interference" which is premised on the mere presence of federal law within a facet of insurance regulation for which the state already has an administrative regime in place.

Appellants, however, do not point to an insurance pricing regulatory goal which is hampered by the application of the civil rights laws to the credit-scoring practice at issue here, save the implied goal of allowing the states to pursue their pricing regulatory goals in isolation, which the *Humana* Court clearly rejected as a relevant state policy goal. We conclude, therefore, that the MFA does not preclude Appellees' claims.[8]

---

[8] Appellants raise two additional arguments. First, Appellants contend that the enforcement of "private actions for damages" which are available under the civil rights statutes but not under the state scheme would serve to impair the state regulatory scheme. However, it is well-settled that the existence of additional remedies does not create a conflict with state law such that MFA preemption may

15

III.

For the foregoing reasons the ruling of the district court with respect to the question of McCarran-Ferguson preemption is herein AFFIRMED.

---

be found. This argument has been expressly rejected by the Supreme Court in *Humana*, by the Fourth Circuit in *Mackey*, 724 F.2d at 421, by the Seventh Circuit in *American Family,* 978 F.2d at 296, by the Sixth Circuit in *Nationwide Mutual*, 52 F.3d at 1363, and by the Ninth Circuit in *Merchants Home Delivery*, 50 F.3d at 1491-92. We likewise reject it here.

In a similar vein, Appellants argue that the fact that the Florida and Texas departments of insurance regulation are investigating the practices at issue here demonstrates that the application of the federal laws in question would impair state law. Here, Appellants' argument is simply that Florida and Texas both have dedicated mechanisms for regulating discriminatory insurance rates, and that these departments regulate insurance prices with a particular expertise. However, the fact that the state also has a mechanism in place for performing a function which the federal law would affect does not create a conflict. Appellants must show that a conflict exists with a particular law, or that an inconsistency exists with state regulatory policy. Here, Appellants only argue that the states already have a scheme in place, and that is not enough to create an MFA preemption.

EDITH H. JONES, Circuit Judge, concurring in part and dissenting in part:

With due respect to my colleagues, I cannot agree that this nationwide class action challenging insurers' use of credit scoring in the pricing of automobile and home owners' policies can proceed intact under the McCarran-Ferguson Act. The allegations of intentional race discrimination under 42 U.S.C. §§ 1981 and 1982 do not appear to be preempted,[9] but they are a diversion. Plaintiffs' principal attack is under the Fair Housing Act against the alleged disparate impact of a facially-neutral component of insurance pricing decisions.

The majority, in my view, fails to recognize that a disparate impact claim goes to the heart of the risk adjustment that underlies the insurance business. The Seventh Circuit cogently observed: "Risk discrimination is not race discrimination." NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 290 (7th Cir. 1992). Every insurer sets its prices according to the risk embodied in covering particular categories of customers. Thus, young male drivers pay higher premiums than young females or mature drivers because of the higher incidents of policy claims made by that group. To be sure, insurers inflict a disparate

_____

[9]In this court, §§ 1981 and 1982 have been confined to cases involving intentional racial discrimination, not disparate impact claims. Arguello v. Conoco, Inc., 207 F.3d 803, 809 n.9 (5th Cir. 2000); Hanson v. Veterans Admin., 800 F.2d 1381, 1385 (5th Cir. 1986).

17

impact upon young male drivers, but hardly anyone argues that the impact is unjustified. The relevant inquiries are whether the price differential reasonably conforms to the risk differential and whether, in a regulated rate system, the insurer has received an appropriate return.

State insurance commissions, like those of Florida and Texas, are set up to regulate rates by overseeing the insurance companies' assessment of risks and differential pricing decisions. Integral to the regulatory regime is a prohibition on "unfair discrimination" in pricing. Tex. Ins. Code Ann. art. 21.21-6 (Vernon 1981 & Supp. 2003); Fla. Stat. ch. 627.031 (2) (2002). No matter the exact statutory regime under which the commissions go about their business, they are called upon to balance, verify and make a quasi-legislative determination concerning the adequacy and appropriateness of rates. <u>Colo. Interstate Gas Co. v. Fed. Power Comm'n</u>, 324 U.S. 581, 589 (1945) ("Rate-making is essentially a legislative function."). Their responsibility is ultimately fulfilled by evaluating the companies' comparative risk determinations. Since risk determinations are mathematically complex and multi-faceted, unraveling a single thread, like credit scoring, that is a component of a risk formula necessarily affects the entire fabric.

Viewed against this backdrop, it is plain that the instant class action inevitably draws federal courts into the mechanics of insurance pricing and, by the same token, must

18

diminish the scope of action available to state insurance commissioners. The plaintiffs really make no pretense to the contrary, as they allege that the premiums charged to them using credit scoring are discriminatory, excessive, unfair, unconscionable, and unlawful. These terms are nearly identical to those in the statutes that guide the Texas and Florida insurance commissions. The plaintiffs, however, are asking the federal courts to examine one thread from the regulatory fabric, while state insurance commissioners remain responsible for the whole. There is thus a significant difference between intentional discrimination claims and disparate impact claims for purposes of McCarran-Ferguson.

The McCarran-Ferguson Act was designed precisely to prevent this type of federal interference with the states' prerogative of insurance regulation. The majority have not only misunderstood the intimate connection between the plaintiffs' claims and insurance rate-making, but they have also interpreted the scope of McCarran-Ferguson preemption too narrowly, and they have misapplied lower court precedents. These errors require brief elaboration.[10] In <u>Humana Inc. v. Forsyth</u>, 525 U.S. 299 (1999), the Supreme Court's analysis of McCarran-Ferguson preemption parallels its venerable tests for determining the supremacy of federal law over the states. Thus, the Court stated that:

---

[10]Because the majority have correctly quoted § 2(b) of the Act and explained its general parameters, I will not repeat those matters here.

19

> While we reject any sort of field preemption, we also reject the polar opposite of that view, _i.e._ that Congress intended a green light for federal regulation whenever the federal law does not collide head-on with state regulation. [The Court quotes a dictionary definition of 'impair' in § 2(b).] The following formulation seems to us to capture that meaning and to construe, most sensibly, the text of § 2(b): when federal law does not directly conflict with state regulation, _and_ when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

_Humana_, 525 U.S. at 309-10 (emphasis added). _Humana_ does not require a direct conflict with state law in order to compel preemption. It is enough that the federal law may "interfere with a State's administrative regime." The majority seems to ignore this clear alternative, however, by repeatedly, and incorrectly, demanding evidence of "an enacted law" or a "declared policy."[11]

---

[11] See, e.g.,, Maj. Opn at 4 (stating that McCarran-Ferguson preemption "analysis will turn on one of two axes: (1) the existence of an express conflict with the letter of the state law, or (2) the frustration of an officially articulated state regulatory goal"); Maj. Opn. at 5 (noting that in Humana "the federal law did not frustrate a _particular_ and _declared_ state regulatory policy" and also stating that the Supreme Court "identified the following three [McCarran-Ferguson] preemption threshold requirements:(1)the federal law in question must not be specifically directed at insurance regulation; (2) there must exist a particular state law (or declared regulatory policy) enacted for the purpose of regulating insurance; and (3) application of the federal law to the controversy in question must invalidate, impair or supercede that state law"); Maj. Opn. at 10 ("Moreover, because Appellants do not identify a state law or policy that would be impaired by the application of the federal statutes, it is impossible for them to prevail on the third Humana prong, i.e., a finding of impairment caused by the application of the federal law"); Maj. Opn. at 12 (noting that Appellants failed "to direct the Court to a particular law or declared regulatory policy" or identify "an actual policy"); Maj. Opn. at 13 (stating that "[t]he approach of a federal statute must tread upon a declared policy goal of the state scheme") and that the appellants have not identified "any law, regulation, or decision in Texas or Florida requiring . . . [or] condoning the credit-scoring practice at issue here").

While I would agree that it is too broad to argue that virtually any federal claim will "interfere" with the state regulatory regime," a contrast between the facts in <u>Humana</u> and the case at bar illustrates why the insurers here are not raising a field preemption defense. In <u>Humana</u>, the Court held that RICO law was not preempted by the McCarran-Ferguson Act. In that case, RICO claims were made against an alleged kick-back scheme between a health insurer and various hospitals in such a way that both the cause of action and its remedy ran parallel to those available under Nevada law. The RICO claim did not require a federal fact-finder to investigate the genesis of the insurer's rates, but only whether kick-backs had been illegally made. Further, Nevada authorized the policing of this kind of activity through private citizen lawsuits in its state court.

In this case, by contrast, any <u>post hoc</u> declaration that credit scoring is impermissible will require a federal court to determine, in order to assess damages, what a fair and "non-discriminatory" rate for the plaintiffs' policies would have been. A more complete overlap with the state insurance commissions' pricing decisions is impossible to conceive. Because of the sensitivity and complexity of the question of unfair policy price discrimination, both Texas and Florida have chosen not to permit plaintiffs to file individual lawsuits in state courts to challenge such decisions. <u>Key Western Life Ins. Co. v. State Bd. of Ins.</u>, 350 S.W.2d 839, 849-50 (Tex. 1961); <u>Int'l Patrol & Detective Agency,</u>

21

<u>Inc. v. Aetna Cas. & Sur. Co.</u>, 396 So. 2d 774, 776 (Fla. Ct. App. 1981), <u>approved by</u> 419 So. 2d 323, 324 (Fla. 1982). Instead, both states have enacted administrative corrective regimes. The plaintiffs' disparate impact suit will thus interfere with the initial rate-making as well as the corrective procedures utilized by the states.

My colleagues take refuge in a string of appellate court decisions that they believe have approved FHA disparate impact cases against insurance companies. Unfortunately, they are wrong. Two of their principal cases pre-date the <u>Humana</u> decision and require direct conflict preemption, a plainly narrower test than that adopted in <u>Humana</u>.[12] <u>See</u> <u>Am. Family Mut. Ins. Co.</u> 978 F.2d at 295-96 ; <u>Nationwide Mut. Ins. Co. v. Cisneros</u>, 52 F.3d 1351, 1363 (6th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1140 (1996). Additionally, both of those cases involved only intentional discrimination claims, not, as here, claims of disparate impact.

The single post-<u>Humana</u> appellate case in this area is <u>Moore v. Liberty Nat'l Life Ins. Co.</u>, 267 F.3d 1209 (11th Cir. 2001), <u>cert. denied</u>, 122 S. Ct. 1608 (2002). <u>Moore</u>, however, involved claims under §§ 1981 and 1982 of intentional racial discrimination in setting premiums for life insurance. This case

---

[12] Likewise, two other cases upon which the majority rely also pre-date <u>Humana</u> and require a direct conflict with a state law. <u>See</u> <u>Merchs. Home Delivery Serv., Inc. v. Frank B. Hall & Co.</u>, 50 F.3d 1486, 1491-92 (9th Cir. 1995); <u>Mackey v. Nationwide Ins. Cos.</u>, 724 F.2d 419, 421 (4th Cir. 1984).

22

concerns auto and homeowners' insurance, not life insurance. Moreover, what I take issue with here is the claim founded upon the allegedly disparate impact of credit history, a facially neutral risk classification factor, utilized within a complex state regulatory scheme.

The circumstances under which the McCarran-Ferguson Act was enacted by Congress further underscore the majority's error in holding that disparate impact claims under the Fair Housing Act are not preempted. In 1944, the Supreme Court held that insurance companies could be liable for antitrust violations under the Sherman Act for activities related to the setting of premiums. United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944). "In reaction to South-Eastern Underwriters, Congress 'moved quickly,' enacting the McCarran-Ferguson Act 'to restore the supremacy of the States in the realm of insurance regulation.'" Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 40 (1996) (quoting Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993)). In particular, one of Congress's primary concerns in enacting the McCarran-Ferguson Act was to exempt insurance ratemaking activities from the antitrust laws. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 221 (1979). In other words, at the very core of the McCarran-Ferguson Act is the insulation of state regulation regarding the fixing of insurance rates from federal laws not specifically directed towards regulating insurance.

23

Whether credit scoring is useful or advisable as a device for insurance pricing, I cannot say.  Florida and Texas have both recently passed laws allowing credit scoring on policies written after January 1, 2004, with numerous limitations.  See Act approved June 11, 2003, 78th Leg., R.S., S.B. 14, §§ 3.01-3.04 (to be codified at Tex. Ins. Code Ann. art. 21.49-2U) (regulating use of credit scoring for purposes of rate setting and underwriting in, inter alia, residential property insurance and personal automobile insurance); 2003 Fla. Laws ch. 407 (to be codified at Fla. Stat. ch. 626.9741) (same); see also Act of Feb. 25, 2003, 78th Leg., R.S., ch. 1, § 3(c), 2003 Tex. Gen. Laws 1, 2 (requiring residential property insurers to provide reports to the Texas Insurance Commissioner regarding the use of credit scoring in underwriting and setting premiums).  Other states' regulatory policies with regard to credit scoring differ, according to the parties' briefs.  But it seems clear to me that federal courts are not competent to tread in the essential domain reserved to state regulators.  In today's case, credit scoring is alleged to have a disparate impact.  Tomorrow, some other facially neutral criterion, such as the age of one's car or the number of one's dependents, or the city of one's residence, may fall under legal attack. Disparate impact claims under the Fair Housing Act are, in my view, squarely preempted by the McCarran-Ferguson Act and by Humana.  On this aspect of the majority opinion, I respectfully dissent.