# United States Court of Appeals for the Federal Circuit

05-5032

JOHN A. GREENE,
Receiver for the Great Global Assurance Company,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Douglas J. Schmidt, Blackwell Sanders Peper Martin LLP, of Kansas City, Missouri, argued for plaintiff-appellee. With him on the brief were Ernest M. Fleischer and Michael D. Fielding.

Robert W. Metzler, Attorney, Tax Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Eileen J. O'Connor, Assistant Attorney General and David I. Pincus, Attorney.

Stephen S. Kaye, Bryan Cave LLP, of Washington, DC, for amicus curiae National Association of Insurance Commissioners.

Frank S. Swain, Baker & Daniels LLP, of Washington, DC, for amici curiae National Organization of Life and Health Insurance Guaranty Associations and National Conference of Insurance Guaranty Funds.

Appealed from: United States Court of Federal Claims

Judge Marian Blank Horn

# United States Court of Appeals for the Federal Circuit

05-5032

JOHN A. GREENE,
Receiver for the Great Global Assurance Company,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  March 8, 2006

_____

Before MICHEL, Chief Judge, BRYSON and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

This is the second appeal in an action by John Greene ("Greene"), receiver in liquidation for Great Global Assurance Company ("Great Global"), to recover $699,849 in tax and interest paid by Great Global in 1990 for the tax year 1983.  On March 27, 1996, Greene filed for a refund in the United States Court of Federal Claims ("CFC"), arguing that the tax was improperly assessed, and in the alternative that Great Global's policyholder and guaranty fund claimants were entitled to priority of distribution over the Internal Revenue Service ("IRS").  Greene intended to distribute the refund to these entities on behalf of the insolvent insurer.

The CFC dismissed Greene's complaint as not having been timely filed.  See Greene v. United States, 42 Fed. Cl. 18 (1998) ("Greene I").  Greene appealed, and we

reversed, holding that the lower court had misconstrued the statute of limitations. See Greene v. United States, 191 F.3d 1341 (Fed. Cir. 1999) ("Greene II"). On remand, the CFC entered summary judgment on October 13, 2004, in favor of Greene. The Government filed a timely notice of appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). For the reasons discussed below, we reverse the judgment of the CFC.

## I.    BACKGROUND

### A.    Facts

The Life Insurance Company Tax Act of 1959 ("Tax Act") introduced a three-phase taxation scheme for life insurance companies. See Pub. L. No. 86-169, 73 Stat. 112 (codified as amended at 26 U.S.C. § 801-20). Of relevance here is Great Global's Phase II and Phase III income. Phase II income represented one-half of an insurer's underwriting gains for that year, and it was tax exempt if it was deposited in a policyholder's surplus account ("PSA"). The policy behind the Tax Act was to incentivize insurers to create PSA cash reserves that would augment their capacity to satisfy future claims. When funds in the PSA were withdrawn, reallocated, or no longer used to further compliance with the insurer's obligations to policyholders, the PSA funds were then taxed as so-called Phase III income. See Greene v. United States, 62 Fed. Cl. 418, 420 (Ct. Cl. 2004) ("Greene III").

To qualify as a life insurance company for tax purposes a company must meet the requirements set forth in 26 U.S.C. § 801(a) (1982). One condition that would trigger tax liability on an insurer's tax-sheltered PSA income was its having ceased to operate as a life insurance company for any two consecutive years. See 26 U.S.C.

§ 815(d)(2)(A)(ii) (1982) (providing that if "for any two successive taxable years the taxpayer is not a life insurance company, then the amount taken into account under section 802(b)(3) for the last preceding taxable year for which it was a life insurance company shall be increased . . . by the amount remaining in its policyholders surplus account at the close of such last preceding taxable year").

In 1983, Great Global filed a federal Life Insurance Company Income Tax Return, on which it claimed zero tax liability. Greene III, 62 Fed. Cl. at 418. However, in 1984 and 1985, it failed to qualify as an insurance company, triggering a retroactive tax liability on $820,961 (its PSA funds) for the 1983 tax year. Id. at 420-21. On February 7, 1986 the Superior Court of the State of Arizona declared Great Global to be insolvent, placed it in receivership, and on June 8, 1988, ordered that it be liquidated. Id. The receivership is still in existence today. On July 9, 1990, the receiver filed an amended return on behalf of Great Global and paid $699,849 in back taxes for 1983, consisting of $357,392 in revised tax liability and $342,457 in interest. On September 24, 1990, the IRS assessed the additional tax and interest on Great Global pursuant to 26 U.S.C. § 6501(c)(6) (1982). See Greene III, 62 Fed. Cl. at 421 (permitting assessment "within three years after the return was filed (whether or not such return was filed on or after the date prescribed) for the taxable year for which the taxpayer ceases to be an insurance company, the second taxable year for which the taxpayer is not a life insurance company, or the taxable year in which the distribution is actually made as the case may be") (quoting 26 U.S.C. § 6501(c)(6)).

On July 8, 1993, Greene filed for a second amended tax return and requested a refund of $699,849, stating two alternative bases for recovery. First, Greene argued

that notwithstanding the plain language of the statute, the IRS could not properly assess a Phase III tax against an insurer in receivership, where shareholders receive nothing, because the purpose of the tax was "to give assurance that underwriting gains made available to shareholders will be subject to the full payment of tax." Second, Greene argued that the tax was incorrectly collected over the competing claims of policyholders, or more precisely, the claims of the Arizona Guaranty Corporation to recover what it had paid to policyholders on Great Global's behalf. The IRS denied Greene's refund claim, which led Greene to file a complaint in the CFC. See Greene I, 42 Fed. Cl. 18. As explained above, the CFC dismissed Greene's claim for untimeliness; Greene appealed, and we reversed that decision and remanded to the CFC.

### B.     CFC Decision on Remand

In remand proceedings before the CFC in Greene III, Greene and the government cross-filed for summary judgment. See 62 Fed. Cl. at 423. Greene advanced two principal arguments. First, he argued that the tax was not properly due and payable, because the sole purpose of the tax was to assure that underwriting gains made available to shareholders would be subject to the full payment of tax, and in light of Great Global's insolvency, shareholders had received nothing. Refusing to delve into legislative intent, the CFC rejected Greene's policy argument, noting that the statutory language was clear on its face—namely, that 26 U.S.C. § 815(d)(2)(A)(ii) (1982) "require[d] that an insurance company's failure to qualify as a life insurance company for two years renders its entire [PSA] balance taxable as income for the last year in which the company qualified as a life insurance company."

Greene's second argument was based on the McCarran-Ferguson Act § 2(b), 15 U.S.C. § 1012(b) (1982). Greene recognized that the federal superpriority statute provided that "[a] claim of the United States Government shall be paid first when a person indebted to the Government is insolvent and . . . an act of bankruptcy is committed." 31 U.S.C. § 3713(a)(1)(A)(iii). However, he argued that the section 2 of the McCarran-Ferguson Act limited the superpriority statute because it stated that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance[.]" Greene pointed to the 1997 revision of Arizona's insurance liquidation statutes, which he argued were regulatory in nature, see Greene III, 62 Fed. Cl. at 423, and which made clear that policyholders' claims and claims by guaranty funds were both senior in priority to IRS claims. See Ariz. Rev. Stat. Ann. § 20-629(A)(1)-(10) (1997) (providing in relevant part for the following claim distribution order from the assets of a delinquent insurer: costs related to administration of the delinquency proceedings; guaranty fund claims; policyholders' insurance claims; federal government claims; employee compensation claims; state and local government claims; claims of other general creditors; and three additional classes of claims).

Greene argued for the applicability of the 1997 version of the Arizona statute over the revisions in effect at any of the following relevant times: 1983, the taxable year; December 31, 1985, the end of the second year that Great Global failed to qualify as a life insurance company under 26 U.S.C. § 815(d)(2)(A)(ii); February 7, 1986, when the Arizona Supreme Court declared Great Global insolvent; June 8, 1988, when the court

entered a liquidation order; July 9, 1990, when Great Global's receiver filed an amended 1983 tax return and paid the tax; July 8, 1993, when Greene filed a second amended tax return; and March 27, 1996, when Greene filed for a refund in the CFC. Greene's preference for the 1997 revision was understandable as unlike earlier revisions, it made crystal clear the priority of policyholder and guaranty fund claims over those of the federal government. However, Greene argued that even under the 1977 revision, which was in effect in 1990 when the tax was assessed and collected, policyholders held "preferred claims" that were entitled to priority over what he alleged to be the mere "general creditor" claims of the federal government. See Ariz. Rev. Stat. Ann. §§ 20-611(A), -629(E) (1977). He urged that the 1977 revision was protected from preemption because of the McCarran-Ferguson Act.

The CFC did not decide which statutory revision, 1997 or 1977, applied. Sidestepping the issue, it appeared to assume that policyholders would have priority under either statute. The court then focused on whether the Arizona Guaranty fund and the Arizona priority statute had the purpose of regulating the business of insurance and of protecting policyholders. Following the First Circuit's opinion in Ruthardt v. United States, the CFC held that the Arizona state priority statute was exempt from preemption under the McCarran-Ferguson Act.[1]  303 F.3d 375 (1st Cir. 2002). It therefore held in favor of Greene, whom it deemed to be entitled to a refund of taxes paid to the

---

[1]     The CFC also cited Ariz. Rev. Stat. Ann. § 20-672, which characterizes guaranty funds as essentially being subrogated to the rights of policyholder claimants. In supplemental briefs, the parties make clear that this was an erroneous citation, which should have been to an analogous provision—namely, § 20-682(A).

government, reasoning that the money should have gone to the Guaranty Fund to reimburse it for payments made to policyholders of the insolvent insurer.

## C. Issues

This case presents us with four issues: first, whether the federal tax was due and payable; second, which version of the Arizona insurance liquidation statutes should be applied in this case; third, whether the applicable state statute granted policyholders' claims priority over those of the federal government; and fourth, if so, did it do it in a manner that escaped preemption—pursuant to the provisions of the McCarran-Ferguson Act—by the federal superpriority statute.

This is an appeal from the CFC's grant of summary judgment, which we review de novo. Promac, Inc. v. West, 203 F.3d 786, 788 (Fed. Cir. 2000). As explained below, we hold that the tax was due and payable, and that the 1977 Arizona priority statute is applicable. Furthermore, because the 1977 statute does not elevate the priority of policyholders above that of government claimants, there is no conflict between the federal superpriority statute and state law. Consequently, McCarran-Ferguson's anti-preemption provisions are not triggered. Because the 1977 statute does not mention guaranty funds, we do not need to decide whether the McCarran-Ferguson Act would allow the claims of guaranty funds to have a priority over those of the federal government, such as is provided for by the 2001 revision of the Arizona priority statute. See Ariz. Rev. Stat. Ann. § 20-629(A)(1)-(11).

## II.    ANALYSIS

### A.    The Tax Was Due and Payable

Pursuant to 26 U.S.C. § 815(d)(2)(A)(ii), Phase III tax liability is imposed upon insurers after a two-year lapse in their insurance operations.  Greene argues that this provision was designed to prevent shareholders from taking advantage of the deferred taxation scheme even while discontinuing obligations to policyholders.  According to Greene, because this concern is not present when an insurance company involuntarily ceases operations, such as by reason of insolvency, this court should decline to give effect to the plain language of the statute.  We reject Greene's invitation to ignore the unambiguous terms of this statute.  Accordingly, we hold the Phase III tax to have been due and payable.

### B.    Priority

We now turn to the issue of priority, namely, whether the federal government's claim against Great Global is entitled to preference over the claims of Great Global's policyholders, or more precisely, preference over the claims of guaranty funds that have paid the policyholders' claims and seek reimbursement from the assets of the insolvent insurer.  Is there a dialectic tension among the various statutes?  The answer to this question depends on the interaction between, and the applicability of, several state and federal statutes.

As we explain below, the first such statute is the federal "superpriority" statute, which provides that the federal government is entitled to first satisfaction of its claims against an insolvent entity.  See 31 U.S.C. § 3713(a)(1)(A)(iii).  The Supreme Court of

the United States has held that this federal priority right attaches upon insolvency and is indefeasible. See Massachusetts v. United States, 333 U.S. 611, 625 (1948).

Other relevant statutes are the multiple revisions of Arizona's scheme for distributing the assets of an insolvent insurer. See Ariz. Rev. Stat. Ann. § 629 (1954) (as amended by acts of 1977, 1991, 1993, 1995, 1997 & 2001). The more recent revisions of the priority statute clearly direct that policyholders and guaranty funds are to be paid ahead of the federal government, and these recent revisions thereby conflict with the mandate of the federal superpriority statute. In addition, the 1997 revision explicitly provides for its retroactive application in all pending insolvency proceedings. Giving effect to this retroactivity provision, however, would require stripping the federal government of its indefeasible right to first priority, as granted by the federal superpriority statute. The 1977 revision—the one that was in effect at the time that Great Global was declared insolvent—did not directly address the relative priorities of the government and policyholders. See Ariz. Rev. Stat. Ann. § 629.

This case would be straightforward—with federal law simply preempting state law in each instance—were it not for the McCarran-Ferguson Act, a federal law that can save state laws from preemption, but only if the purpose of the state law is to regulate the business of insurance. However, as we set forth in more detail below, the McCarran-Ferguson Act does not restrain the federal superpriority statute from preempting the retroactive application of Arizona's newer priority statutes. The only revision of the priority statute not thereby preempted was the one in effect in 1986 when the Great Global insolvency was declared—namely, the 1977 revision. After additional analysis, however, we conclude that the McCarran-Ferguson Act does not save even

the 1977 revision from preemption by the federal superpriority statute. Thus, the government is entitled to priority of payment of the tax due.

### 1. Federal Superpriority Statute

The federal superpriority statute provides that "[a] claim of the United States Government [e.g., for taxes] shall be paid first when a person indebted to the Government is insolvent and . . . an act of bankruptcy is committed." 31 U.S.C. § 3713(a)(1)(A)(iii). Section 3713 "is the direct descendent of § 3466 of the Revised Statutes, which had been codified in 31 U.S.C. § 191." United States v. Estate of Romani, 523 U.S. 517, 519 n.1 (1998).

Not only does the federal superpriority statute provide that the federal government be paid first, but it has been construed to provide that once the right to first payment has attached, that right is vested and indefeasible. See Massachusetts v. United States, 333 U.S. at 625 (holding that pursuant to § 3466 of the Revised Statutes, the predecessor of the current superpriority statute, "the priority given is in terms absolute, not conditional[ and o]nce attaching, it is final and conclusive"); id. at 627 n.26 ("Congress . . . created a conclusive priority attaching as of the time of insolvency . . . .").

### 2. McCarran-Ferguson Act

The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ." McCarran-Ferguson Act, Pub. L. No. 79-15, § 2(b), ch. 20, 59 Stat. 33, 34 (1945)

(codified as amended at 15 U.S.C. § 1012(b) (2005)). Before examining the meaning of the act, we briefly describe its history.

Before 1944, the United States Supreme Court had consistently held that the dormant Commerce Clause of the United States Constitution did not invalidate state laws relating to insurance. See, e.g., United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 534 (1944) ("For seventy-five years this Court has held . . . that the Commerce Clause of the Constitution does not deprive the individual states of power to regulate and tax specific activities of foreign insurance companies which sell policies within their territories . . . [notwithstanding that] negotiation and execution of the companies' policy contracts involved communications of information and movements of persons, moneys, and papers across state lines."). Indeed, in 1869 the Court had declared, in the context of a Dormant Commerce Clause case that "issuing a policy of insurance is not a transaction of commerce." Paul v. Virginia, 75 U.S. (8 Wall.) 168, 183 (1869).

In 1944, the United States Supreme Court was first confronted with a challenge to the power of Congress to affirmatively regulate interstate insurance pursuant to its Commerce Clause powers. In South-Eastern Underwriters, a number of insurance companies had been indicted for violating sections of the Sherman Act that prohibited the monopolization of commerce; and the district court had sustained a demurrer on the grounds that insurance was not "commerce." 322 U.S. at 534-35. In reversing the district court's dismissal of the indictment, the Supreme Court made clear that the regulation of interstate insurance was within Congress' power pursuant to the Commerce Clause. See id. at 553 ("No commercial enterprise of any kind which

05-5032                                                    11

conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance.").

Congress reacted to the holding in South-Eastern Underwriters by passing the McCarran-Ferguson Act. See United States Dep't of Treasury v. Fabe, 508 U.S. 491, 499 (1993) (discussing the history of the Act). The McCarran-Ferguson Act provides that statutes enacted pursuant to Congress's Commerce Clause powers could not preempt state insurance laws unless the federal statute has explicitly provided for such preemption. In other words, the act "impos[es] what is, in effect, a clear-statement rule." Id. at 508.

In Fabe, the United States Supreme Court made clear that "[t]he McCarran-Ferguson Act did not simply overrule South-Eastern Underwriters and restore the status quo[, but that t]o the contrary, it transformed the legal landscape by overturning the normal rules of pre-emption." 508 U.S. at 507. As explained by the Supreme Court in Humana Inc. v. Forsyth, the McCarran-Ferguson Act is triggered only by a clear conflict between state insurance law and a federal statute of general applicability. 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application."). McCarran does not create reverse field preemption. See id.

### 3. The Arizona Priority Statutes

Until 1977, Arizona did not provide any special treatment for policyholders' claims. Then, the legislature revised its statutes to provide that "[u]npaid claims, including claims for unearned premiums or cash values, which arise out of and are within the coverage of insurance policies issued by the insolvent insurer shall have preference over and shall be paid prior to payments of claims of general creditors." Ariz. Rev. Stat. Ann. § 20-629(E) (1977) (replaced by § 20-629(A) (1993)). Read in combination with the definition of a "preferred claim," see § 20-611, the Arizona statutes in effect from 1977 to 1993 afforded policyholders the status of preferred claimants. Of course, in light of the federal superpriority statute, § 20-611 would also seem to make the federal government a preferred claimant, and the Arizona statute that was in effect through 1993 provided no explicit resolution on the issue of whether the state statute ranked policyholder claims higher than those of the federal government.

This version of the statute remained in effect through March 25, 1993, during which time the IRS assessed and collected the tax on Great Global. This provision was replaced by a far more specific distribution statute, which provided in relevant part for the following distribution order: administrative costs; certain employee wage claims; guaranty fund claims; policyholder claims; claims of the federal, state and local governments; and other general creditor claims. See Act of March 26, 1993, Ch. 141, § 3, 1993 Ariz. Legis. Serv. (West) (codified at Ariz. Rev. Stat. Ann. § 20-629(A)).

On June 11, 1993, less than three months after Arizona enacted the new distribution statute, the United States Supreme Court declared portions of a similar Ohio statute not to be "'for the purpose of regulating the business of insurance,' within the

meaning of . . . the McCarran-Ferguson Act . . . ." Fabe, 508 U.S. at 493. The Ohio statute had ranked government claims behind administrative expenses, wage claims, policyholders' claims and claims of general creditors. See id. at 493, 495 & n.2 (citing Ohio Rev. Code Ann. § 3903.42 (1989)). The Court held that "the Ohio priority statute escapes pre-emption . . . to the extent that it protects policyholders." Id. at 491. Thus, it held that the McCarran-Ferguson Act's anti-preemption provisions extended to the preferential payment of administrative costs, as these were indirectly necessary to protect policyholders. See id. at 509 ("Without payment of administrative costs, liquidation could not even commence."). However, it held that wage claims and other general creditor claims, did not escape preemption. See id. at 509 (explaining that "[t]he preferences conferred upon employees and other general creditors . . . do not escape pre-emption because their connection to the ultimate aim of insurance is too tenuous").

On remand, the district court applied Ohio law to conclude that the preempted provisions of the state distribution statute were not severable from the section as a whole, and accordingly found the section to be invalid in its entirety. See Duryee v. U.S. Dep't of the Treasury, 6 F. Supp. 2d 700, 706 (D. Ohio 1995). While Duryee was pending, Arizona made minor revisions to the statute in 1995, choosing to retain its pre-Fabe scheme. See Act of March 29, 1995, Ch. 19, § 1, 1995 Ariz. Legis. Serv. (West)

(codified at Ariz. Rev. Stat. Ann. § 20-629(A)).[2] The district court filed its decision in Duryee less than five months later, on August 14, 1995.

After Duryee, the severability of Arizona's preempted wage claim priority from the remainder of the statute (and consequently, the validity of the statute) remained undecided under Arizona state law, as Fabe did not invalidate the entire section of the Ohio statute, but only the wage claim preference. However, Arizona legislators did appear to respond to Fabe and Duryee in 1997 when they provided amended priority rankings in which only administrative costs and policyholder and guaranty fund claims were superior to federal government claims. The new legislation provided for the following priority: administrative costs; guaranty fund claims; policyholders' claims; federal government claims; state and local government claims; claims of other general creditors; and claims by three additional lower-ranked groups.[3] See Act of April 29, 1997, Ch. 272, § 1, 1997 Ariz. Legis. Serv. (West) (codified at Ariz. Rev. Stat. Ann. § 20-629(A)).

Section 3 of this Act also included a severability provision to guard against any possibility of total invalidation, as had occurred with Ohio's priority statute in Duryee. Id. Section 2 made explicit that the 1997 revision was to apply retroactively "to all delinquency proceedings begun after the effective date of this act and to all delinquency

_____

[2] The 1995 Act, which amended parts of both § 20-629 and -682, included language making a small portion of the changes retroactive. See Act of March 29, 1995, ch. 19, § 3(B) ("This act does not affect currently pending litigation concerning guaranty fund coverage for guaranteed investment contracts that are issued by an insurer that is the subject of receivership proceedings that are commenced before the effective date of this act.").

[3] See also Ariz. Circular Letter 97-6 (July 21, 1997) (open letter from John Greene in his capacity as Director of Insurance, describing the 1997 revisions as "Fabe Cure Legislation").

proceedings pending on the effective date of this act in which a final distribution in payment of claims has not been made . . . ." Id. (emphasis added). In this case, it is not disputed that the proceedings were pending in 1997, and that no final distribution has been made.

In 2001, the Arizona legislature made only minor changes to the distribution statute, which remains in effect today. See Act of May 4, 2001, Ch. 328, § 2, 2001 Ariz. Legis. Serv. (West) (codified as amended at Ariz. Rev. Stat. Ann. § 20-629(E) (2005)). Unlike the 1997 Act, however, the 2001 Act did not contain an explicit retroactivity statement. Id.

### 4. Choice of State Priority Statute

Here, we must first decide which version of the Arizona statute to apply. Although on appellate review courts do not generally apply statutes retroactively to pre-enactment events, there are exceptions to that rule. See Landgraf v. USI Film Prods., 511 U.S. 244, 273 (1994) (recognizing a presumption against statutory retroactivity, but explaining that "in many situations, a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit" and that a presumption against retroactivity will not apply when the legislature has unambiguously provided for the retroactive application of a new law); United States v. Schooner Peggy, 5 U.S. 103, 1 Cranch. 103 (1801) (reversing a decree in response to a treaty that issued while the appeal was pending and that provided for the retroactive reassignment of rights to a French vessel as between its French owners and the U.S. government). Indeed, outside of the context of criminal statutes, legislatures are generally free to impart retroactivity upon statutes through the use of express

provisions. See, e.g., U.S. Trust Co. v. New Jersey, 431 U.S. 1, 17 n.13 (1977) ("The Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly "harsh and 'oppressive.'" (quoting Welch v. Henry, 395 U.S. 134, 147 (1938))).

When the legislature has not included an express retroactivity provision, however, the determination of whether or not a statute should be applied retroactively becomes more intricate. For example, under Arizona law, the general rule is that a law can be accorded retroactive effect only if the law explicitly provides for retroactive application. See Ariz. Rev. Stat. Ann. § 1-244 (2005) ("No statute is retroactive unless expressly declared therein."). However, there is a judicially-created exception to that rule: Even if the law does not explicitly provide for retroactive application, it may be applied retroactively only if it is merely procedural, rather than substantive. See Aranda v. Indus. Comm'n, 11 P.3d 1006, 1009 (Ariz. 2000) ("This court has . . . created an exception to the general rule requiring express language of retroactivity. Enactments that are procedural only, and do not alter or affect earlier established substantive rights may be applied retroactively." (citing In re Shane B., 7 P.3d 94 (Ariz. 2000))).

At first blush, this court appears to be confronted with the necessity of deciding a question of Arizona law—namely whether the current (2001) version of the priority statute, § 20-629(A), which lacks an express retroactivity provision, nonetheless has retroactive application. This, in turn, would require us to predict whether the Arizona courts would consider priority rights to be substantive or procedural pursuant to the Aranda test. However, we do not need to reach this issue, because we conclude that a state cannot retroactively deprive the federal government of its priority rights—not even

where it does so <u>explicitly</u>, as it has done in its 1997 revisions.  The relative order of relevant priorities is identical under both the 1997 and 2001 revisions.

The fundamental problem with the retroactive application of a priority statute that divests the United States of its right to priority is that it conflicts with the federal priority statute as construed by the Supreme Court to provide a priority right that is indefeasible as of the date of insolvency—which in this case is February 7, 1986.  <u>See</u> <u>Massachusetts v. United States</u>, 333 U.S. at 625, 627 n.26.  In short, the conflict is this: under federal law, the government's priority right cannot be altered by events that occur post-insolvency; Arizona's amended priority laws, to the extent that they are retroactive, alter this indefeasible right of the government to priority of payment under federal law.

Therefore, the retroactivity provision of the Arizona statute must fall pursuant to the Supremacy Clause of the U.S. Constitution, unless it is protected by the McCarran-Ferguson Act, which provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of <u>regulating</u> the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ."  Pub. L. No. 79-15, § 2(b), ch. 20, 59 Stat. 33, 34 (1945) (emphasis added).  In turn, the question is whether Arizona's retroactive shuffling of priorities to payment of claims against an insolvent insurer is "for the purpose of regulating the business of insurance."  <u>Id.</u>

We hold that it is not.  In so doing, we recognize that in <u>Fabe</u>, the Supreme Court rejected the notion that "regulation of insurance" was restricted to the "<u>business</u> of insurance," <u>Fabe</u>, 508 U.S. at 505 (emphasis added), making clear that the touchstone of regulation is instead <u>the extent to which it protects policyholders</u>:

> The Ohio priority statute is designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy. Because it is <u>integrally related to the performance of insurance contracts after bankruptcy</u>, Ohio's [prospectively applied] law is one "enacted by any State for the purpose of regulating the business of insurance."

<u>Id.</u> at 504 (citing the McCarran-Ferguson Act, 15 U.S.C. § 1012(b)) (emphasis added).

Notwithstanding, <u>Fabe</u> did not involve a priority statute that was being applied <u>retroactively</u>, and it did not decide the issue that is before us today. We are keen to avoid inappropriately expanding the holding of <u>Fabe</u>, especially given that such an expansion would tend to eviscerate the McCarran-Ferguson Act's "regulation" constraint. Our concerns are heightened by the perverse consequences of extending McCarran-Ferguson protection to <u>retroactively</u>-applied statutes. Consider the following. This action was filed on March 27, 1996 under 28 U.S.C. § 1341(a)(1), which grants jurisdiction over actions "for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." It would seem peculiar to read § 1341(a)(1) as permitting actions for the recovery of taxes that were properly and legally collected at the time of collection and at the time of filing suit, and that were only rendered erroneous by subsequent state legislation. Doing so would likely invite state legislatures to exempt their citizens from federal tax liability by simply enacting appropriate statutes that apply retroactively. See <u>Van Den Wymelenberg v. United States</u>, 397 F.2d 443, 445 (7th Cir. 1968) ("Were the law otherwise there would exist considerable opportunity for 'collusive' state court actions having the sole purpose of reducing federal tax liabilities."); <u>Piel v. Comm'r</u>, 340 F.2d 887, 891 (2d Cir. 1965) ("What is income is controlled by federal law and retroactive judgments of state courts cannot thus affect the rights of the federal government under its tax laws.").

Consequently, the 1997 and 2001 versions of the Arizona statute cannot retroactively render erroneous a tax that was properly and legally collected at the time of collection and at the time of filing suit.

In short, we hold that the <u>retroactive</u> application of new priority statutes—whether pursuant to the express provision of the 1997 Arizona priority statute or as a consequence of whatever retroactive effect might be accorded to the 2001 statute in light of Arizona decisional law—simply fails to constitute regulation of the business of insurance, as required by the McCarran-Ferguson Act. Consequently, the McCarran-Ferguson Act does not prevent the preemption of those provisions of state law that provide for the application of state priority laws to insolvency proceedings commenced before the enactment of the substantive change in the priority statute.

5.      Arizona's 1977 Priority Statute is Preempted

Thus, we must apply the 1977 version of the Arizona priority statute—the statute that was in effect in 1986, at the time of the insurer's insolvency. From 1954 to the present, Arizona has defined a "preferred claim" against an insolvent insurer as being "any claim with respect to which the law of the state or of the United States accords priority of payments from the general assets of the insurer." Ariz. Rev. Stat. Ann. § 20-611(8) (1954) (currently codified at § 20-611(9), pursuant to Act of April 6, 2001, ch. 58, § 10 (S.B. 1022) 2001 Ariz. Legis. Serv. (West)).

Here, there are two relevant § 20-611 "preferred claims": the tax claim of the United States government and policyholder claims. The former claims are "preferred" pursuant to the federal superpriority statute. The latter are "preferred" pursuant to Ariz. Rev. Stat. Ann. § 20-629(E) (1977), which provides that "[u]npaid claims, including

claims for unearned premiums or cash values, which arise out of and are within the coverage of insurance policies issued by the insolvent insurer shall have <u>preference over</u> and shall be paid prior to payments of claims of general creditors." (emphasis added). The statute does not explicitly provide for the priority of one of these "preferred claims" over the other.

Now, we are faced with a second preemption problem, again from the federal superpriority statute. The federal superpriority statute clearly provides the government with first priority. Conversely, in the 1977 priority statute, the Arizona legislature fails to express any clear preference about whether government claims or policyholder claims should be paid first. To the extent that there is conflict between these statutes, the state statute must yield, except if it is protected from preemption by section 2(b) of the McCarran-Ferguson Act.

The inquiry is whether the federal superpriority statute "invalidate[s], impair[s], or supersede[s]" a state law relating to the "regulation of the business of insurance." As discussed above, the Supreme Court in <u>Fabe</u> was quite clear that state statutes that protect policyholders from losses due to their insurer's insolvency deal with the "regulation of the business of insurance." The sole question here is whether a federal statute that requires the federal government to be paid first "invalidate[s], impair[s], or supersede[s]" a state law that expresses, on its face, no preference in order of payment.

The Supreme Court's holding in <u>Humana Inc. v. Forsyth</u> helps to answer this question. There, the Court held that "[t]he term 'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law.'" 525 U.S. at 307 (internal citations omitted). Here, a federal statute that insists on a priority order cannot

logically be said to render ineffective a statute that is silent. Similarly, the Supreme Court held that "the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'" Id. (internal citations omitted). Again, this does not describe the situation at bar. No part of the Arizona statute has been displaced. To the contrary, it has merely been supplemented. Finally, we turn to the Humana Court's construction of the term "impair." It held that pursuant to the "impair" prong of McCarran, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Id. at 310. Given that the state statute is silent as to the relative priority of the federal government over policyholders within the same class of claimants—the class of "preferred claimants"—we can discern no "impairment" here. Therefore, the federal government is entitled to full priority of payment—a priority which it has in fact received.

### 6. Guaranty Fund Issue

As discussed above, the Supreme Court in Fabe upheld an Ohio priority law that was similar to the Arizona statute because it ranked the priority of insurance policyholder claims above those of the United States. Fabe, 508 U.S. at 493. In addition the Court upheld the preference "accorded by Ohio to the expenses of administering the insolvency proceeding [as] reasonably necessary to further the goal of protecting policyholders." Id. at 509. In so doing, it suggested that not only would the federal preemption statute be triggered where state law directly protected policyholders, but where it also indirectly protected policyholders, such as through the state's having

priority to recover expenses (such as administrative costs necessary to liquidate the company) that were "reasonably necessary" to protect their interests.

In the recent case of Ruthardt v. United States, the First Circuit applied Fabe's "reasonable necessity" test to determine what kinds of expenses could be recoverable under state law as part of the cost of protecting a policyholder, while still satisfying the requirements of the McCarran-Ferguson Act. 303 F.3d 375, 381-82 (1st Cir. 2002). Specifically at issue was whether a state priority statute could avoid being preempted by federal law where it allowed for a state guaranty fund to pay out claims to policyholders and then assume priority creditor status with respect to those amounts. The court recognized that "strictly speaking, the priority that Massachusetts gives to guaranty funds is not absolutely 'necessary' – from a short-term perspective – to assure payment by the funds to policyholders." Id. at 381. However, it upheld the priority accorded to guaranty fund claims as entitled to protection from preemption under the McCarran-Ferguson Act. See id. at 382 (holding that "priorities that indirectly assure that policyholders get what they were promised can also trigger McCarran-Ferguson protection . . . ").

In light of our decisions above, however, we need not reach these issues. The 1977 revision of the Arizona priority statute (Ariz. Rev. Stat. Ann. § 20-629) did not mention guaranty fund claims. Moreover, even if guaranty funds were somehow viewed to have had a status equivalent to that of policyholder claims, the result would be the same: government claims would trump both. In summary, because we have held that the 1977 revision of Arizona's priority statutes did not provide policyholders' claims with

a preference over federal government claims, the government's tax claims necessarily take precedence over the claims of the guaranty fund, as well.

REVERSED

No costs.