HUMANA INC. ET AL. *v.* FORSYTH ET AL.

No. 97–303.   Argued November 30, 1998—Decided January 20, 1999

300

*James W. Colbert III* argued the cause for petitioners. With him on the briefs were *Robert N. Eccles, Linda J. Smith, Neil K. Gilman,* and *Dennis L. Kennedy.*

*G. Robert Blakey* argued the cause for respondents. With him on the brief was *J. Randall Jones.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Hunger, Jeffrey A. Lamken, Anthony J. Steinmeyer,* and *Howard S. Scher.*[*]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns regulation of the business of insurance by the States, as secured by the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.,* and the extent to which federal legislation, specifically, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. § 1961 *et seq.,* is compatible with state regulation. The controversy before us stems from a scheme employed by petitioner Humana Health Insurance of Nevada, Inc. (Humana Insurance), a group health insurer, to gain discounts for hospital services which the insurer did not disclose and pass on to its policy beneficiaries. The scheme is alleged to violate both Nevada law and RICO. Under the McCarran-

---

[*]*James F. Fitzpatrick* and *Nancy L. Perkins* filed a brief for the Alliance of American Insurers et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the National Association of Insurance Commissioners by *Gregory B. Stites;* for the National Fair Housing Alliance by *Stephen Mark Dane;* for Trial Lawyers for Public Justice, P. C., by *Sarah Posner;* for United Policyholders by *Eugene R. Anderson* and *John A. MacDonald;* and for Betty Cordial et al. by *Ellen G. Robinson* and *Peter G. Gallanis.*

*Franklin G. Burt* filed a brief for the Consumer Credit Insurance Association as *amicus curiae.*

Ferguson Act, the federal legislation may be applied if it does not "invalidate, impair, or supersede" the State's regulation. 15 U. S. C. § 1012(b).

The federal law at issue, RICO, does not proscribe conduct that the State's laws governing insurance permit. But the federal and state remedial regimes differ. Both provide a private right of action. RICO authorizes treble damages; Nevada law permits recovery of compensatory and punitive damages. We hold that RICO can be applied in this case in harmony with the State's regulation. When federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran-Ferguson Act does not bar the federal action.

I

Plaintiffs in the District Court, respondents in this Court, are beneficiaries of group health insurance policies issued by Humana Insurance. Between 1985 and 1988, plaintiffs-respondents received medical care from the Humana Hospital-Sunrise, an acute care facility owned by codefendant (now copetitioner) Humana Inc. Humana Insurance agreed to pay 80% of the policy beneficiaries' hospital charges over a designated deductible. The beneficiaries bore responsibility for payment of the remaining 20%. But pursuant to a concealed agreement, the complaint in this action alleged, the hospital gave Humana Insurance large discounts on the insurer's portion of the hospital's charges for care provided to the policy beneficiaries.[1]  As a result,

---

[1] These discounts were alleged to have ranged between 40% and 96%. See 827 F. Supp. 1498, 1503 (Nev. 1993). For example, in a given case, Humana Insurance might have received a bill for only $550 on a $5,000 gross hospital charge. The beneficiary, however, would have received a bill for 20% of the undiscounted rate of $5,000, or $1,000. Humana Insurance would have paid only 35% of the total bill ($550 out of $1,550), while the beneficiary would have paid 65%. Under the 80%/20% arrangement, Humana Insurance should have paid $1,240 (80% of $1,550), while the beneficiary should have paid $310. See id., at 1508; Brief for United States as Amicus Curiae 5–6.

Humana Insurance paid significantly less than 80% of the hospital's actual charges for the care that policy beneficiaries received, and the beneficiaries paid significantly more than 20% of those charges.[2]

The employee beneficiaries brought suit in the United States District Court for the District of Nevada,[3] alleging that Humana Insurance and Humana Inc. violated RICO through a pattern of racketeering activity consisting of mail, wire, radio, and television fraud.[4] Defendants Humana Insurance and Humana Inc. moved for summary judgment, citing § 2(b) of the McCarran-Ferguson Act, which provides:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  15 U. S. C. § 1012(b).

The District Court granted the motion.  In that court's view, RICO's private remedies, including the federal statute's treble damages provision, 18 U. S. C. § 1964(c), so exceeded Nevada's administrative penalties for insurance fraud, see *infra*, at 311–312, that applying RICO to the alleged conduct would have been "tantamount to allowing Congress to intercede in an area expressly left to the states under

---

[2] State investigation of the scheme, launched by Nevada's Attorney General, terminated when Humana Insurance and Nevada's Insurance Commissioner entered into a consent decree under which the insurer paid a fine of $50,000.

[3] The complaint separated plaintiffs into two classes, a "Co-Payor Class" comprising employee beneficiaries, and a "Premium Payor Class" comprising employers who purchased the policies.  See 114 F. 3d 1467, 1472 (CA9 1997).  Only the employees' claims have been placed at issue here.

[4] The complaint also presented claims under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.*, and § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 2.  The disposition of those claims is not germane to the issue on which this Court's review was sought and granted.

the McCarran-Ferguson Act," 827 F. Supp. 1498, 1521–1522 (Nev. 1993).[5]

The Ninth Circuit reversed in relevant part. See 114 F. 3d 1467, 1482 (1997). In *Merchants Home Delivery Serv., Inc.* v. *Frank B. Hall & Co.*, 50 F. 3d 1486 (1995), a decision handed down after the District Court rejected the policy beneficiaries' right to sue under RICO in this case, the Court of Appeals adopted a "direct conflict" test for determining when a federal law "invalidate[s], impair[s], or supersede[s]" a state law governing insurance. As declared in *Merchants Home*, the McCarran-Ferguson Act does not preclude "application of a federal statute prohibiting acts which are also prohibited under a state's insurance laws." *Id.*, at 1492. Guided by *Merchants Home*, and assuming that Nevada law provided for administrative remedies only, the Ninth Circuit held that the McCarran-Ferguson Act did not bar suit under RICO by the Humana Insurance policy beneficiaries. See 114 F. 3d, at 1480. Circuit courts have divided on the question presented: Does a federal law, which proscribes the same conduct as state law, but provides materially different remedies, "impair" state law under the McCarran-Ferguson Act?[6] We granted certiorari to address that question. 524 U. S. 936 (1998).

---

[5] Both the District Court and the Court of Appeals inaccurately projected Nevada law as allowing for administrative remedies only. See *infra*, at 311–313.

[6] Compare *Merchants Home Delivery Serv., Inc.* v. *Frank B. Hall & Co.*, 50 F. 3d 1486, 1492 (CA9 1995), and *NAACP* v. *American Family Mut. Ins. Co.*, 978 F. 2d 287, 297 (CA7 1992) ("[S]tate and federal rules that are substantively identical but differ in penalty do not conflict with or displace each other."), with *Doe* v. *Norwest Bank Minnesota, N. A.*, 107 F. 3d 1297, 1307 (CA8 1997) ("[T]he intrusion of RICO's substantial damage provisions into a state's insurance regulatory program may so impair the state law as to bar application of RICO."), and *Kenty* v. *Bank One, Columbus, N. A.*, 92 F. 3d 384, 392 (CA6 1996) ("The different liability under Ohio law for violations, as well as different standards of proof necessary to demonstrate misrepresentations, means that RICO does impair the ability of Ohio to regulate [unfair and deceptive acts].").

## II

Prior to our decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944), we had consistently held that the business of insurance was not commerce. See, *e. g., Paul* v. *Virginia*, 8 Wall. 168, 183 (1869) ("Issuing a policy of insurance is not a transaction of commerce."); see also *South-Eastern*, 322 U. S., at 544, n. 18 (collecting cases relying on the *Paul* generalization). The business of insurance, in consequence, was largely immune from federal regulation. See *St. Paul Fire & Marine Ins. Co.* v. *Barry*, 438 U. S. 531, 539 (1978) ("[T]he States enjoyed a virtually exclusive domain over the insurance industry."). In *South-Eastern*, we held for the first time that an insurance company doing business across state lines engages in interstate commerce. See 322 U. S., at 553. In accord with that holding, we further decided that the Sherman Act applied to the business of insurance. See *id.*, at 553–562.

Concerned that our decision might undermine state efforts to regulate insurance, Congress in 1945 enacted the McCarran-Ferguson Act. Section 1 of the Act provides that "continued regulation and taxation by the several States of the business of insurance is in the public interest," and that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U. S. C. § 1011. In § 2(b) of the Act—the centerpiece of this case—Congress ensured that federal statutes not identified in the Act or not yet enacted would not automatically override state insurance regulation. Section 2(b) provides that when Congress enacts a law specifically relating to the business of insurance, that law controls. See § 1012(b). The subsection further provides that federal legislation general in character shall not be "construed to invalidate, impair, or supersede any law

enacted by any State for the purpose of regulating the business of insurance." *Ibid.*[7]

The McCarran-Ferguson Act thus precludes application of a federal statute in face of state law "enacted . . . for the purpose of regulating the business of insurance," if the federal measure does not "specifically relat[e] to the business of insurance," and would "invalidate, impair, or supersede" the State's law. See *Department of Treasury* v. *Fabe*, 508 U. S. 491, 501 (1993). RICO is not a law that "specifically relates to the business of insurance." This case therefore turns on the question: Would RICO's application to the employee beneficiaries' claims at issue "invalidate, impair, or supersede" Nevada's laws regulating insurance?

The term "invalidate" ordinarily means "to render ineffective, generally without providing a replacement rule or law." Brief for United States as *Amicus Curiae* 17, n. 6 (citing *Carter* v. *Virginia*, 321 U. S. 131, 139 (1944) (Black, J., concurring)). And the term "supersede" ordinarily means "to displace (and thus render ineffective) while providing a substitute rule." Brief for United States as *Amicus Curiae* 17, n. 6 (citing *Illinois Commerce Comm'n* v. *Thomson*, 318 U. S. 675, 682 (1943)). Under these standard definitions, RICO's

---

[7] Section 2(b) also provides that "after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U. S. C. 41 et seq.], shall be applicable to the business of insurance to the extent that such business is not regulated by State Law." 15 U. S. C. § 1012(b). Section 4 of the Act provides that "[n]othing contained in this chapter shall be construed to affect in any manner the application to the business of insurance of the Act of July 5, 1935, as amended, known as the National Labor Relations Act [29 U. S. C. 151 et seq.], or the Act of June 25, 1938, as amended, known as the Fair Labor Standards Act of 1938 [29 U. S. C. 201 et seq.], or the Act of June 5, 1920, known as the Merchant Marine Act, 1920 [46 App. U. S. C. 861 et seq.]." § 1014.

application to the policy beneficiaries' complaint would neither "invalidate" nor "supersede" Nevada law.

The key question, then, is whether RICO's application to the scheme in which the Humana defendants are alleged to have collaborated, to the detriment of the plaintiff policy beneficiaries, would "impair" Nevada's law. The answer would be "no" were we to read "impair," as the policy beneficiaries suggest, to be "interchangeabl[e]" with "invalidate" and "supersede." Brief for Respondents 14; see Brief for United States as *Amicus Curiae* 17, n. 6 (describing the use of the three terms as an "instanc[e] of lawyerly iteration"). The answer would also be "no" if we understood "impair" to mean "the displacement of some portion of a statute or its preclusion in certain contexts." *Id.*, at 14. This is so because insurers can comply with both RICO and Nevada's laws governing insurance. These laws do not directly conflict. The acts the policy beneficiaries identify as unlawful under RICO are also unlawful under Nevada law. See *infra*, at 311–313.

On the other hand, the answer would be "yes" were we to agree with Humana Insurance and Humana Inc. that the word "impair," in the McCarran-Ferguson Act context, signals the federal legislators' intent "to withdraw Congress from the field [of insurance] absent an express congressional statement to the contrary." Brief for Petitioners 10. Under that reading, "impair" would convey "a very broad proscription against applying federal law where a state has regulated, *or chosen not to regulate*, in the insurance industry." *Merchants Home*, 50 F. 3d, at 1491 (emphasis in original). See also Reply Brief 4 (McCarran-Ferguson Act "precludes federal law that is at material variance with state insurance law—as to substantive prohibitions, procedures or remedies.").

We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise. If

Congress had meant generally to preempt the field for the States, Congress could have said, as the Ninth Circuit noted: "No federal statute [that does not say so explicitly] shall be construed to *apply* to the business of insurance." *Merchants Home,* 50 F. 3d, at 1492 (emphasis in original) (internal quotation marks omitted); see Brief for United States as *Amicus Curiae* 24 ("The Act does not declare that 'No Act of Congress shall apply to the business of insurance unless such Act specifically relates thereto.'"). Alternatively, Congress could have provided, as it did with respect to the Sherman, Clayton, and Federal Trade Commission Acts, see 15 U. S. C. § 1012(b), that federal legislation generally, or RICO in particular, would be "applicable to the business of insurance [only] *to the extent that* such business *is not regulated* by State Law," *ibid.* (emphasis added).

Moreover, § 2(b)'s second prohibition bears attention in this regard. That proscription, barring construction of federal statutes to "invalidate, impair, or supersede" "any [state] law . . . which imposes a fee or tax upon [the business of insurance]," belies any congressional intent to preclude federal regulation merely because the regulation imposes liability additional to, or greater than, state law. Were this not so, federal law would "impair" state insurance laws imposing fees or taxes whenever federal law imposed additional fees or greater tax liability. Under our federal system of dual taxation, however, it is scarcely in doubt that "generally applicable federal fees and taxes do not 'invalidate, impair, or supersede' state insurance taxes and fees within the meaning of Section 2(b) where nothing precludes insurers from paying both." Brief for United States as *Amicus Curiae* 26.

While we reject any sort of field preemption, we also reject the polar opposite of that view, *i. e.,* that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation. The dictionary definition of "impair" is "[t]o weaken, to make

worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." Black's Law Dictionary 752 (6th ed. 1990). The following formulation seems to us to capture that meaning and to construe, most sensibly, the text of § 2(b): When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application. See Brief for National Association of Insurance Commissioners as *Amicus Curiae* 6–7.

Our decision in *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85 (1983), is similar in tenor. In that case, we considered whether a New York law forbidding discrimination in employee benefit plans on the basis of pregnancy was preempted by ERISA. State agencies and officials, appellants in *Shaw*, argued that the State's law was not preempted; they relied on ERISA § 514(d), which provides that ERISA's preemption clause shall not be "construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U. S. C. § 1144(d). The state agencies and officials maintained that preempting the state law would impair the administration of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U. S. C. § 2000e *et seq.*, as amended in 1978 by the Pregnancy Discrimination Act, 92 Stat. 2076, 42 U. S. C. § 2000e(k), for under the enforcement scheme Title VII accommodates, state remedies serve to promote compliance with federal antidiscrimination prescriptions. See 463 U. S., at 101–102.

We held in *Shaw* that the New York law was preempted only to the extent it prohibited practices lawful under Title VII. See *id.*, at 103. To the extent the New York law prohibited practices also prohibited under federal law, we explained, the New York law was not preempted; the blanket preemption urged by the employer appellees in *Shaw*, we pointed out, would "impair" Title VII by "frustrat[ing] the

goal of encouraging joint state/federal enforcement of [that federal measure]." *Id.*, at 102. *Shaw* thus supports the view that to "impair" a law is to hinder its operation or "frustrate [a] goal" of that law.

Our standard accords with *SEC* v. *National Securities, Inc.*, 393 U. S. 453 (1969). In that case, we upheld, in face of a McCarran-Ferguson Act challenge, the Securities and Exchange Commission's authority to unwind an insurance company merger that the Arizona Director of Insurance had approved. Our opinion pointed to the absence of any "direct conflict": "Arizona has not commanded something which the Federal Government seeks to prohibit. It has permitted respondents to consummate the merger; it did not order them to do so." *Id.*, at 463. But that statement did not stand alone. We also observed that "any 'impairment' in [that] case [was] a most indirect one." *Ibid.* And we concluded: "The paramount federal interest in protecting shareholders [was] perfectly compatible with the paramount state interest in protecting policyholders." *Ibid.* There, as here, federal law did not "directly conflict with state regulation," application of federal law did not "frustrate any declared state policy," nor did it "interfere with a State's administrative regime." *Supra*, at 310.

Applying the standard just announced to the facts of this case, we conclude that suit under RICO by policy beneficiaries would not "impair" Nevada law and therefore is not precluded by the McCarran-Ferguson Act. Nevada provides both statutory and common-law remedies to check insurance fraud. The Nevada Unfair Insurance Practices Act, Nev. Rev. Stat. § 686A.010 *et seq.* (1996), patterned substantially on the National Association of Insurance Commissioners' model Unfair Trade Practices Act,[8] is a comprehensive administrative scheme that prohibits various forms of insur-

---

[8] See 4 National Association of Insurance Commissioners, Model Laws, Regulations and Guidelines 880–1 (1995).

ance fraud and misrepresentation.[9]   Under this legislation, Nevada's Insurance Commissioner has the authority to issue charges if there is reason to believe the Act has been violated, see § 686A.160, and may issue cease and desist orders and administer fees, see § 686A.183.

Victims of insurance fraud may also pursue private actions under Nevada law.   The Unfair Insurance Practices Act authorizes a private right of action for violations of a number of unfair insurance practices, including "[m]isrepresenting to insureds or claimants pertinent facts or insurance policy provisions relating to any coverage," § 686A.310(1)(a).   See § 686A.310(2) ("In addition to any rights or remedies available to the commissioner, an insurer is liable to its insured for any damages sustained by the insured as a result of the commission of any act set forth in subsection 1 as an unfair practice.").   Moreover, the Act is not hermetically sealed; it does not exclude application of other state laws, statutory or decisional.   Specifically, Nevada law provides that an insurer is under a common-law duty "to negotiate with its insureds in good faith and to deal with them fairly." *Ainsworth* v. *Combined Ins. Co. of Am.*, 104 Nev. 587, 592, 763 P. 2d 673, 676 (1988); see *United States Fidelity & Guaranty Co.* v. *Peterson*, 91 Nev. 617, 620, 540 P. 2d 1070, 1071 (1975) (recognizing tort action against insurance company for breach of implied covenant of good faith and fair dealing).[10]

---

[9] See, *e. g.*, Nev. Rev. Stat. § 686A.030 (1996) (misrepresentation and false advertising); § 686A.040 (publication of false information); § 686A.070 (falsification of records and financial statements); §§ 686A.281–686A.289 (fraudulent claims); § 686A.291 (insurance fraud).

[10] The existence of private rights of action under state law dilutes the force of the assertion, made in an *amicus* brief, that a decision affirming the Ninth Circuit's judgment would cause insurers to be reluctant to settle with state commissioners to avoid compromising defenses in RICO litigation.   See Brief for Consumer Credit Insurance Association as *Amicus Curiae* 5.   Presumably, insurers would be equally reluctant to settle with state commissioners to avoid compromising defenses in state litigation.

Furthermore, aggrieved insured parties may be awarded punitive damages if a jury finds clear and convincing evidence that the insurer is guilty of "oppression, fraud or malice." Nev. Rev. Stat. § 42.005(1) (1995). Nevada's punitive damages statute places certain limits on those damages—three times the amount of compensatory damages if they are more than $100,000, and $300,000 if compensatories are less than $100,000. See §§ 42.005(1)(a), (b). But the same law adds that these limits do not apply to claims against "[a]n insurer who acts in bad faith regarding its obligations to provide insurance coverage." § 42.005(2)(b).[11] Accordingly, plaintiffs seeking relief under Nevada law may be eligible for damages exceeding the treble damages available under RICO.[12]

In sum, we see no frustration of state policy in the RICO litigation at issue here. RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief. In this regard, we note that Nevada filed no brief at any stage of this lawsuit urging that application of RICO to the alleged conduct would frustrate any state policy, or interfere with the State's administrative regime. Cf. *NAACP* v. *American Family*

---

[11] See also Nev. Rev. Stat. § 42.007(2) (1996) (limiting punitive damages liability by employers for wrongful acts of employees except in "an action brought against an insurer who acts in bad faith regarding its obligations to provide insurance coverage").

[12] At oral argument, counsel for petitioners Humana Insurance and Humana Inc. suggested that application of RICO would impair state law, even though that law provided for punitive damages, because under Nevada law, punitive damages may not be imposed when doing so would threaten the solvency of the defendant. Tr. of Oral Arg. 5–6. While Nevada law does appear to prohibit punitive damages that would render a defendant insolvent, see *Nevada Cement Co.* v. *Lemler*, 89 Nev. 447, 452, 514 P. 2d 1180, 1183 (1973) (noting that "[i]deally the punitive allowance should be in an amount that would promote the public interest without financially annihilating the defendant" and that "the wrongdoer may be punished, but not destroyed"), the record contains no evidence of insolvency here. See Tr. of Oral Arg. 21.

*Mut. Ins. Co.*, 978 F. 2d 287, 297 (CA7 1992) ("No official of Wisconsin has appeared in this litigation to say that a federal remedy under the Fair Housing Act would frustrate any state policy."). We further note that insurers, too, have relied on the statute when they were the fraud victims. See, *e. g., Aetna Casualty Surety Co.* v. *P & B Autobody*, 43 F. 3d 1546, 1551 (CA1 1994); see also Brief for United Policyholders as *Amicus Curiae* 19–21.

\* \* \*

Because RICO advances the State's interest in combating insurance fraud, and does not frustrate any articulated Nevada policy, we hold that the McCarran-Ferguson Act does not block the respondent policy beneficiaries' recourse to RICO in this case. Accordingly, for the reasons stated in this opinion, the judgment of the Court of Appeals for the Ninth Circuit is

*Affirmed.*