**Janie KONDELL, Plaintiff,**

**v.**

**BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., Defendant.**

**CASE NO. 0:15-CV-61118-ROSEN-BERG/BRANNON**

United States District Court,
S.D. Florida.

Signed May 9, 2016

Alan H. Rolnick, Daniel Alvarez Sox, Andres Rivero, Rivero Mestre LLP, Coral Gables, FL, for Plaintiff.

Christopher Murphy, McDermott Will & Emery, Chicago, IL, Justin Brian Uhlemann, Marcos Daniel Jimenez, Robert Michael Kline, McDermott Will & Emery LLP, Miami, FL, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

ROBIN L. ROSENBERG, UNITED STATES DISTRICT JUDGE

THIS CAUSE is before the Court on Defendant Blue Cross and Blue Shield of Florida, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint [DE 27].[1] The Court has carefully considered Defendant's Mo-

---

1. Defendant also filed an unredacted copy of its Motion to Dismiss under seal. See DE 33.

tion to Dismiss, Plaintiff's [2] Response [DE 40], Defendant's Reply [DE 46], and Plaintiff's Sur-Reply [DE 49]. In addition, the Court held a hearing on Defendant's Motion to Dismiss on April 7, 2016, and is otherwise fully advised in the premises. For the reasons set forth below, Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's Amended Complaint [DE 15] is **DISMISSED WITH PREJUDICE.**

## I. INTRODUCTION

This is a dispute between Janie Kondell ("Plaintiff"), a woman diagnosed with Hepatitis C more than a decade ago, and her insurer, Blue Cross and Blue Shield of Florida, Inc. ("Defendant"), arising from the denial of Plaintiff's request that Defendant cover the cost of a breakthrough drug called Harvoni. At the center of this dispute are certain guidelines—referred to but not set forth in Plaintiff's insurance policy—pursuant to which Defendant makes decisions regarding Harvoni coverage. While Plaintiff concedes that she did not qualify for coverage under these guidelines at the time her request for coverage was denied, Plaintiff challenges the development and implementation of these guidelines in the first place.

Plaintiff alleges—on her own behalf and on behalf of a putative class—that the development and implementation of these guidelines constitute a breach of contract, a breach of the implied covenant of good faith and fair dealing, and multiple violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). Essentially, Plaintiff's claims are grounded in the allegation that Defendant—acting in concert with others—has used these guidelines to substitute cost for medical necessity as the basis for its decisions regarding Harvoni coverage, despite Defendant's contractual obligation to cover any treatment that is medically necessary and its continued representations that medical necessity is its sole consideration.

Guided by the allegations in Plaintiff's Amended Complaint, the terms of the insurance policy attached to Plaintiff's Amended Complaint, Florida law, and certain legal principles governing the relationship between federal law and state insurance law, the Court concludes that Plaintiff's claims must be dismissed with prejudice.

## II. BACKGROUND [3]

Plaintiff Janie Kondell was diagnosed with Hepatitis C, a progressive liver disease, in 2005. Am. Compl., DE 15 ¶¶ 35–36. In October of 2014, the U.S. Food and

2. The Amended Complaint was filed by two Plaintiffs: Janie Kondell and Jacques Skutt. *See* DE 15. In its Motion to Dismiss, however, Defendant argues that Plaintiff Jacques Skutt's claims must be dismissed as moot. *See* DE 27 at 6–8. In her Response, Plaintiff Janie Kondell indicates that she is now the sole named Plaintiff in this case, conceding that Plaintiff Jacques Skutt no longer qualifies for membership in the putative class on whose behalf the Amended Complaint was filed. *See* DE 40 at 4 n.11. Counsel for Plaintiffs also acknowledged during the April 7, 2016 hearing on Defendant's Motion to Dismiss that Plaintiff Jacques Skutt's claims should be dis-

missed as moot pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* Hrg. Tr. 4:11–5:1. Accordingly, Plaintiff Jacques Skutt's claims are dismissed, and all future references to Plaintiff in this Order will be in the singular, referring only to Plaintiff Janie Kondell.

3. The background facts set forth herein are drawn mostly from Plaintiff's Amended Complaint and the exhibits attached thereto. For the purposes of this Order, the Court views the Amended Complaint in the light most favorable to Plaintiff and accepts all of Plaintiff's well-pleaded facts as true. *See Am. Unit-*

Drug Administration ("FDA") approved Harvoni, a medication taken once daily in pill form, for the treatment of Hepatitis C. *Id.* ¶ 5. In February of 2015, Plaintiff's physician recommended that she begin taking Harvoni and requested prior authorization for the medication from Plaintiff's insurer, Defendant Blue Cross and Blue Shield of Florida, Inc. *Id.* ¶ 67. That request was denied. *Id.* .

## A. Plaintiff's Policy

At the time, Plaintiff was insured by Defendant under the BlueOptions Everyday Health 1416 policy ("Plaintiff's Policy"). *Id.* ¶ 24. Pursuant to the terms of Plaintiff's Policy, Defendant provides coverage for a Health Care Service or Prescription Drug only if all coverage criteria listed in the Policy are met. *See* Plaintiff's Policy, DE 15-1 at 15 (listing the coverage criteria for Health Care Services under the heading "WHAT IS COVERED?"); *id.* at 39 (listing the coverage criteria for Prescription Drugs under the heading "PRESCRIPTION DRUG PROGRAM"); *see also id.* at 124 (defining "Health Care Services"); *id.* at 131 (defining "Prescription Drug"). Among other requirements, a Health Care Service or Prescription Drug must be both "Medically Necessary" and, under certain circumstances, authorized for coverage in advance. *See id.* at 15, 39.

### 1. Medically Necessary

With respect to the requirement that a Health Care Service or Prescription Drug be "Medically Necessary," Plaintiff's Policy includes numerous references to: (1) the definition of "Medically Necessary" set forth in the "DEFINITIONS" section of the Policy; (2) the "MEDICAL NECESSITY" section of the Policy; (3) Defendant's application of certain additional coverage and payment guidelines in effect at the time a coverage decision is made; and (4) Defendant's exclusive authority to determine whether or not a particular Health Care Service or Prescription Drug is "Medically Necessary" for coverage purposes.

For example, within the "WHAT IS COVERED?" section, Plaintiff's Policy clarifies that a Health Care Service must be Medically Necessary "as defined in this Contract and determined by us [Defendant] in accordance with our Medical Necessity coverage criteria in effect at the time Services are provided or authorized." *See id.* at 15. On the same page, Plaintiff's Policy explicitly states that "[a]ll benefits for Covered Services are subject to . . . our Medical Necessity guidelines then in effect (see the MEDICAL NECESSITY and BLUEPRINT FOR HEALTH PROGRAMS sections)." *See id.*

The "MEDICAL NECESSITY" section, in turn, notes: "In order for Health Care Services to be covered under this Contract, the Services must meet all of the requirements to be a Covered Service, including being Medically Necessary, as

---

ed *Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1066 (11th Cir.2007) (citing *St. Joseph's Hosp. v. Hospital Corp. of America,* 795 F.2d at 954 (11th Cir.1986)). Where appropriate, and with the explicit consent of Plaintiff's counsel, the Court also relies on certain documents attached to Defendant's Motion to Dismiss. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1281 (11th Cir.2007) (citing *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999)) (noting that a court may look beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) if "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."); *see also* Hrg. Tr. 9:21–10:8.

determined by us [Defendant] and defined in this Contract." *See id.* at 59. That section goes on to state: "In applying the definition of Medical Necessity to a specific Service, we [Defendant] may apply our coverage and payment guidelines then in effect." *See id.* That section concludes by suggesting that the insured "refer to the DEFINITIONS section for the definition of "Medically Necessary or Medical Necessity." *See id.*

Finally, the definition of "Medically Necessary," set forth in the DEFINITIONS section of Plaintiff's Policy, includes the following statement: "In applying the definition of medical necessity in this Contract, we [Defendant] may apply our coverage and payment guidelines then in effect." *See id.* at 126–27.

With respect to Defendant's authority, referred to throughout Plaintiff's Policy, to determine whether or not a particular Health Care Service or Prescription Drug is "Medically Necessary" for coverage purposes, the limits of such authority are explained as follows:

> [A]ny review of medical necessity by us [Defendant] is solely for the purpose of determining coverage or benefits under this Contract and not for the purpose of recommending or providing medical care.... Any such review ... is strictly for the purpose of determining, among other things, whether a Service provided or proposed meets the definition of medical necessity in this Contract as determined by us.... You are free to obtain a Service even if we deny coverage because the Service is not medically necessary; however, you will be solely responsible for paying for the Service.

*See id.* at 127; *see also id.* at 59.

## 2. Prior Authorization

With respect to the requirement that a Health Care Service or Prescription Drug

be authorized for coverage in advance, Plaintiff's Policy includes numerous references to: (1) the BLUEPRINT FOR HEALTH PROGRAMS section of the Policy; (2) Defendant's "utilization management" program; (3) Defendant's Medication Guide; and (4) once again, Defendant's exclusive authority to determine whether or not a particular Health Care Service or Prescription Drug is "Medically Necessary" for coverage purposes.

For example, within the "WHAT IS COVERED?" section, Plaintiff's Policy clarifies that a Health Care Service must be authorized in advance by Defendant "if prior coverage authorization is required (see the BLUEPRINT FOR HEALTH PROGRAMS section)." *See id.* at 15. The BLUEPRINT FOR HEALTH PROGRAMS section, in turn, explains: "We [Defendant] have established (and from time to time establish) various ... benefit utilization management and utilization review programs. We call these the Blueprint for Health Programs. The Blueprint for Health Programs, are designed to ... help us facilitate the management and review of coverage and benefits provided under our policies ...." *See id.* at 73. That section goes on to explain: "Certain NetworkBlue Providers have agreed to participate in our focused utilization management program.... These NetworkBlue Providers have agreed not to bill, or collect, any payment whatsoever from you or us ... with respect to a specific Health Care Service if ... we [Defendant] determine from our review under the focused utilization management program that a Health Care Service is not Medically Necessary in accordance with our Medical Necessity criteria or is inconsistent with our benefit guidelines then in effect ...." *See id.* at 74.

The BLUEPRINT FOR HEALTH PROGRAMS section also refers to the

Medication Guide, stating: "You or your Physician will be required to obtain prior coverage authorization from us for certain ... Prescription Drugs, as denoted with a special symbol in the Medication Guide .... For a list of ... medications that require prior coverage authorization and details on how to get an authorization, please refer to the Medication Guide." *See id.* at 75; *see also id.* at 128 (defining "Medication Guide"). Similarly, the PRE-SCRIPTION DRUG PROGRAM section of Plaintiff's Policy clarifies that a Prescription Drug must be authorized in advance "if prior coverage authorization is required as indicated with a unique identifier in the Medication Guide, then in effect." *See id.* at 39. That section also notes that "you may access the ... Medication Guide on your member account at www.FloridaBlue.com or call the customer service phone number on your ID Card." *See id.*

## B. Denial of Harvoni Coverage

At the time Plaintiff's physician recommended that she begin taking Harvoni in February of 2015, Harvoni was among the Prescription Drugs for which prior coverage authorization was required. Accordingly, Plaintiff's physician requested prior coverage authorization for Harvoni. *See* DE 15 ¶ 67. Defendant's Pharmacy Benefit Manager, Prime Therapeutics, LLC ("Prime"), processed that request. *See id.* In a letter dated February 23, 2015, Prime informed Plaintiff that her request had been denied. *See id.*; DE 33-3. Following an internal appeal of that decision, Defendant affirmed the denial. *See* DE 15 ¶¶ 69, 71. In a letter dated April 1, 2015, Defen-

dant informed Plaintiff that coverage had been denied because Harvoni was not a "Medical Necessity" as defined in Plaintiff's Policy, explaining that Plaintiff did not meet the criteria set forth in Medical Coverage Guideline 09-J0000-53. *See* DE 33-3.

At the time Plaintiff requested prior coverage authorization for Harvoni, Defendant's Medical Coverage Guideline 09-J0000-53 provided that use of Harvoni "is a medical necessity for the treatment of chronic hepatitis C when," among other things, the insured has a "[d]ocumented Metavir score of F3 or greater ... [or a d]ocumented transient elastography (Fibroscan) score greater than or equal to 9.5 kPa." *See* DE 33-2. Plaintiff, by her own admission, did not meet these criteria. *See* DE 15 ¶ 71. While Plaintiff does not dispute that she did not meet the criteria of Medical Coverage Guideline 09-J0000-53 at the time her request was denied, Plaintiff challenges the development and implementation of that Guideline.

In January of 2015, several months after the FDA's approval of Harvoni, the Blue Cross and Blue Shield Association ("BCBSA")[4] issued a report titled "Cost-Effectiveness Studies of New Hepatitis C Treatments." *See id.* ¶ 47. In that report, the BCBSA represented that "the American Association for the Study of Liver Disease[s] (the "AASLD") had identified 'categories of patients who should have higher priority for treatment,' [such] as those 'with advanced fibrosis (Metavir F3), [or] compensated cirrhosis (Metavir F4) ....'" *See id.* The following month, Prime denied Plaintiff's request under Defendant's Medical Coverage Guideline 09-

---

4. The BCBSA is the trade association for the 37 licensed Blue Cross and Blue Shield plans throughout the country. *See* DE 15 ¶ 44. De-

fendant is BCBSA's Florida licensee and affiliate. *Id.*

J0000-53 in part because Plaintiff did not have a documented Metavir score of F3 or greater.[5] *See* DE 33-2. Plaintiff suggests that this chain of events, together with the fact that Defendant, Prime, and other BCBSA licensees and affiliates regularly communicate with each other through the BCBSA, establishes a conspiracy between Defendant, Prime, and the BCBSA to deny coverage for Harvoni through the use of "secret, cost-based criteria," rather than approving coverage where Harvoni is "Medically Necessary." *See id.* ¶¶ 74, 80, 90.

### C. **Plaintiff's Claims**

Plaintiff's Amended Complaint contains five counts brought on behalf of Plaintiff individually and on behalf of a putative class. Count I asserts that the denial of Plaintiff's request for Harvoni coverage constitutes a breach of the terms of Plaintiff's Policy. Count II asserts that the denial of Plaintiff's request also constitutes a breach of the implied covenant of good faith and fair dealing. Counts III through V[6] seek relief under RICO.

In its Motion to Dismiss, Defendant argues that each of the five counts in Plaintiff's Amended Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court will briefly set forth the applicable legal standard before considering each count of Plaintiff's Amended Complaint in turn.

### III. LEGAL STANDARD

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). When determining whether a claim has facial plausibility, "a court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir.2007).

However, the court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663, 129 S.Ct. 1937. "Mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do, and a plaintiff cannot rely on naked assertions devoid of further factual enhancement." *Franklin v.*

5. The AASLD subsequently issued a report clarifying that it had "proposed that the sickest patients be treated first, but all patients who receive advice from their doctor to take newest medications should not be denied. The decision across the board should be in the hands of the clinician and the patient to make the decision. Unfortunately payers across America are denying treatment when a doctor has prescribed it for their patient. We ada-

mantly disagree with this decision." *See* DE 15 at 48 (citing "AALSD Position on Treating Patients with Chronic Hepatitis C Virus," http://www.aasld.org/aasld-position-treating-patients-chronic-hcv#sthash.7K1Z3Xqy.pdf).

6. Count V is mistakenly labeled Count VI in Plaintiff's Amended Complaint. *See* DE 15 at 48.

*Curry*, 738 F.3d 1246, 1251 (11th Cir.2013). "[I]f allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir.2012). In sum, "[t]he plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir.2013) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

In addition to satisfying the pleading requirements of Rule 8(a)(2), a claim sounding in fraud must be stated with sufficient particularity to satisfy the heightened pleading standard of Rule 9(b). *See* Fed. R. Civ. P. 9(b) (requiring a party alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake). While a number of Plaintiff's claims are subject to this heightened pleading standard, those claims are subject to dismissal for reasons unrelated to whether that standard has been met. Accordingly, the Court need not address the heightened pleading standard any further.

## IV. DISCUSSION

The Court now addresses each of the five counts contained in Plaintiff's Amended Complaint. For the reasons set forth below, the Court concludes that all five must be dismissed.

### A. Count I: Breach of Contract

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir.2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla.Dist.Ct.App.2008). Focusing on the second of these three requirements, the Court concludes that Plaintiff's Amended Complaint fails to state a plausible claim for breach of contract. Count I must therefore be dismissed.

As an initial matter, the Court notes that the precise theory underlying Plaintiff's claim for breach of contract is obscured by the hyperbolic rhetoric and conclusory allegations throughout Plaintiff's Amended Complaint. This problem is compounded by the fact that little attention has been paid to this claim in the parties' briefing on Defendant's Motion to Dismiss. The following discussion therefore starts with a summary of Plaintiff's claim for breach of contract as construed by the Court before setting forth the Court's analysis of that claim under governing law.

As far as the Court can discern, Plaintiff alleges that Defendant is contractually required to cover Harvoni because (1) the terms of Plaintiff's Policy require Defendant to cover any treatment that is "Medically Necessary" as defined in the Policy and (2) Harvoni is "Medically Necessary" as defined in the Policy. *See* DE 15 ¶¶ 24–31, 82–83. Plaintiff thus alleges that meeting the definition of "Medically Necessary" is the *only* requirement for coverage under the terms of the Policy. *See id.* ¶ 82. Rather than approving Harvoni coverage as "Medically Necessary," however, Defendant allegedly denied coverage—and therefore breached the terms of Plaintiff's Policy—on the basis of Medical Coverage Guideline 09-J0000-53, to which Plaintiff refers as "secret, cost-based criteria," or "undisclosed, pretextual, purported 'medical criteria.'" *See id.* ¶¶ 44–88, 132–33.

However, Plaintiff's Policy—which is attached to her Amended Complaint—con-

tradicts her allegation that meeting the definition of "Medically Necessary" is the only requirement for coverage under the terms of the Policy.[7] Rather, as discussed at length above, Plaintiff's Policy sets forth numerous coverage criteria for Health Care Services and Prescription Drugs, including but not limited to meeting the definition of "Medically Necessary" and, under certain circumstances, being authorized for coverage in advance. *See* DE 15-1 at 15, 39; *see also supra* at 3–6. Plaintiff's Policy also sets forth the requisite elements of each coverage criterion. *See, e.g.,* DE 15-1 at 59 (addressing "Medical Necessity"), 126–27 (defining "Medically Necessary"), 73–77 (addressing utilization management program and prior coverage authorization). Throughout these and other sections, Plaintiff's Policy contains numerous references to Defendant's authority to rely on its coverage and payment guidelines in effect at the time a coverage decision is made. *See id.* at 15, 59, 74, 127. Thus, Plaintiff's Policy also contradicts her allegation that these guidelines, including Medical Coverage Guideline 09-J0000-53, constitute "undisclosed" or "secret" coverage criteria.

■ In Florida, "[i]nsurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Prudential Prop. & Cas. Ins. Co. v. Swindal,* 622 So.2d 467, 470 (Fla.1993). Thus, an insured is entitled only to the coverage set forth in the agreement between the parties. While "[a]mbiguities are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy," *see id.* the Court finds no ambiguity with respect to Defendant's authority to rely on its coverage and payment guidelines in effect at the time a

coverage decision is made. Under the plain language of Plaintiff's Policy, Defendant is authorized to rely on Medical Coverage Guideline 09-J0000-53 in connection with determining whether Harvoni is Medically Necessary and, in turn, approving or denying a request for prior coverage authorization.

Plaintiff does not dispute that, at the time her request was denied, she did not meet the criteria set forth in Medical Coverage Guideline 09-J0000-53. Under that Guideline, use of Harvoni "is a medical necessity for the treatment of chronic hepatitis C when," among other things, the insured has a "[d]ocumented Metavir score of F3 or greater ... [or a d]ocumented transient elastography (Fibroscan) score greater than or equal to 9.5 kPa." *See* DE 33-2. Plaintiff, by her own admission, did not meet these criteria. *See* DE 15 ¶ 71.

For these reasons, the Court concludes that Plaintiff has failed to state a plausible claim for breach of contract. Count I of the Amended Complaint must therefore be dismissed. The Court further concludes that amendment would be futile, as Plaintiff cannot state a plausible claim with the facts presented. The dismissal of Count I is therefore with prejudice. *See Bohringer v. Bayview Loan Servicing, LLC,* 141 F.Supp.3d 1229, 1246 (S.D.Fla.2015) (citing *Bryant v. Dupree,* 252 F.3d 1161, 1163 (11th Cir.2001)); *Fenn v. Litton Loan Servicing LP,* No. 6:10–CV–965–ORL–28, 2010 WL 8318866, at *3 (M.D.Fla. Dec. 10, 2010) (citing *Feinberg v. Leach,* 243 F.2d 64, 68 (5th Cir.1957)).

### B. Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant argues in its Motion to Dismiss that Count II of the Amended Com-

---

7. "[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v.*

*Irvin,* 496 F.3d 1189, 1206 (11th Cir.2007) (citing *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir.1974)).

plaint must be dismissed with prejudice because, in Florida, there is no common law action for breach of the implied covenant of good faith and fair dealing in the first-party insurance coverage context. *See* DE 27 at 12 (citing *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So.3d 541 (Fla.2012); *Nirvana Condo. Ass'n, Inc. v. QBE Ins. Corp.*, 589 F.Supp.2d 1336 (S.D.Fla.2008)). In responding to Defendant's Motion to Dismiss, Plaintiff failed to address this argument. Counsel for Plaintiff acknowledged that fact during the hearing on Defendant's Motion to Dismiss, and conceded on the record that Count II of the Amended Complaint should be dismissed. *See* Hrg. Tr. 8:15–24. Accordingly, Count II is dismissed with prejudice.

### C. Counts III through V: RICO

Defendant raises numerous arguments for dismissal of Counts III through V of the Amended Complaint, all of which seek relief under RICO. The Court need only address one of these arguments. For the reasons set forth below, the Court concludes that the McCarran-Ferguson Act precludes the application of RICO in this case. Counts III, IV, and V must therefore be dismissed.

### 1. Plaintiff's RICO Claims

As a general matter, Plaintiff's claims are grounded in the allegation that Defendant has substituted cost for medical necessity as the basis for its decisions regarding Harvoni coverage. With respect to Plaintiff's RICO claims in particular, Plaintiff alleges that Defendant—acting in concert with others—has deliberately misrepresented the terms of Plaintiff's Policy and the reasons behind its coverage decisions. While continuing to represent that its sole consideration is medical necessity, Defendant has allegedly developed and implemented Medical Coverage Guideline 09-J0000-53 as a means to deny medically necessary Harvoni for financial reasons.

Plaintiff alleges that Defendant, Prime, and the BCBSA form an enterprise referred to by Plaintiff as the Blue Cross and Blue Shield Enterprise ("BCBSE"). DE 15 ¶ 90. Plaintiff further alleges that the BCBSE is engaged in a scheme to deny coverage for Harvoni by manipulating and controlling the prescriptions recommended by treating physicians and concealing the manner in which that manipulation is carried out. DE 15 ¶ 93. Specifically, the members of the BCBSE allegedly share and disseminate claims processing and utilization management information in order to develop and apply guidelines to deny claims on the basis of financial expediency rather than medical necessity. *Id.*

In the course of executing this scheme, Plaintiff alleges that each member of the BCBSE has committed acts of mail fraud by using the U.S. Postal Service to send and receive "the Policies, any modifications to the policies, premiums payments, as well as correspondence relating to premiums, acceptance of premiums, requests for coverage, and denials of coverage," and has committed acts of wire fraud by transmitting and receiving the "Policies, guidelines recommending the use of cost-based criteria to deny medically-necessary treatment, premium payments, correspondence relating to premiums, acceptance of premiums, requests for coverage, and denials of coverage" by wire. *Id.* ¶¶ 96–97. These "matter and things" transmitted by mail and by wire allegedly contained "false and fraudulent misrepresentations that coverage determinations under the Policies will be made in accordance with the medical

necessity definition in the Policies," as well as "denials of coverage of the Plaintiffs' and Class Members' doctors' prescriptions for Harvoni treatment that falsely or fraudulently claimed to have been made in accordance with the medical necessity definition in the policies." *Id.* ¶ 98. By repeatedly delivering "documents containing material misrepresentations and omissions concerning coverage for Harvoni treatment, as well as misrepresentations that such coverage determinations would be based on medical necessity," the BCBSE has allegedly been engaged in a pattern of racketeering activity since at least 2013. *Id.* ¶¶ 108–110.

### 2. McCarran-Ferguson Act

■ "The McCarran-Ferguson Act ... precludes application of a federal statute in face of state law 'enacted ... for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." *Humana, Inc. v. Forsyth,* 525 U.S. 299, 307, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (quoting *U.S. Dep't of Treasury v. Fabe,* 508 U.S. 491, 501, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993)); *see also* 15 U.S.C. § 1012(b). "RICO is not a law that 'specifically relates to the business of insurance.'" *Forsyth,* 525 U.S. at 307, 119 S.Ct. 710. The Court must therefore determine whether applying RICO in the instant case would "invalidate, impair, or supersede" Florida's laws regulating insurance.

### a. Invalidate or Supersede

As explained by the United States Supreme Court, the definitions of "invalidate" and "supersede" are relatively straightforward. "The term 'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law.' And the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'" *Id.* (internal citations omitted). In other words, state insurance law is neither invalidated nor superseded unless it is rendered ineffective by the application of a federal statute.

### b. Impair

The definition of "impair" and its proper application in this context are a bit more elusive. In *Forsyth,* the Court rejected the view "that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation," explaining: "The dictionary definition of 'impair' is '[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner.'" *Id.* at 309–310, 119 S.Ct. 710 (quoting Black's Law Dictionary 752 (6th ed. 1990)). In other words, "to 'impair' a law is to hinder its operation or 'frustrate [a] goal' of that law." *Id.* at 311, 119 S.Ct. 710.

Thus, the *Forsyth* Court concluded, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Conversely, when federal law does directly conflict with state regulation, or when application of the federal law would frustrate any declared policy or interfere with a State's administrative regime, the McCarran-Ferguson Act precludes its application.

■ This "fact-intensive interpretation of the word 'impair' requires a court to focus on the precise federal claims assert-

ed." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 927 F.Supp.2d 870, 878 (C.D.Cal. 2013) (quoting *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 967 (8th Cir.2008)). "A broadly-drafted federal statute, such as RICO, may impair state insurance laws in some circumstances but not in others, depending on the theory of liability asserted and the relief sought by [the] plaintiffs." *Id.* (quoting *Saunders*, 537 F.3d at 967).

Applying these principles, the *Forsyth* Court concluded that the application of RICO would not impair Nevada insurance law, and was therefore not precluded by the McCarran-Ferguson Act, because: (1) Nevada law provided a private right of action for various unfair insurance practices, including misrepresenting facts or policy provisions relating to insurance coverage; (2) Nevada insurance law did not exclude application of other state laws, both statutory and decisional, such as the common law duty to negotiate with insureds in good faith and deal with them fairly; and (3) Nevada law provided for punitive damages, which in some cases could exceed the treble damages available under RICO. *See id.* at 311–13, 119 S.Ct. 710. For those reasons, the *Forsyth* Court concluded that RICO would not frustrate Nevada state policy, but would instead complement Nevada's statutory and common law claims for relief.

### 3. Florida Insurance Law

In light of the Supreme Court's fact-intensive interpretation of the word "impair," the Court focuses on the specific allegations supporting Plaintiff's RICO claims in selecting certain relevant provisions of the Florida Insurance Code[8] (the "Code") to set forth herein.

With respect to Defendant's alleged reliance on cost as the basis for its Harvoni coverage decisions, the Court notes that the Code specifically requires the use of cost-containment procedures or provisions—such as Defendant's "utilization management program"—in the health insurance context. *See* Fla. Stat. § 627.4234 ("A health insurance policy or health care services plan which provides medical, hospital, or surgical expense coverage ... must contain one or more of the following procedures or provisions to contain health insurance costs or cost increases ... (3) [u]tilization review....").

With respect to Defendant's alleged misrepresentation as to the terms of Plaintiff's Policy, the Court notes that the Code prohibits such misrepresentation. Specifically, Florida's Unfair Insurance Trade Practices Act, Fla. Stat. § 626.951 *et seq.* ("FUITPA"), contained within the Code, defines "unfair methods of competition and unfair or deceptive acts or practices" to include "[k]nowingly making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, statement, sales presentation, omission, comparison, or property and casualty certificate of insurance altered after being issued, which ... misrepresents the benefits, advantages, conditions, or terms of any insurance policy." *See* Fla. Stat. § 626.9541(1)(a).

However, the Code does not provide a private right of action for such misrepresentation. *See Joseph v. Bernstein*, 612 Fed.Appx. 551, 557 (11th Cir.2015) (citing Fla. Stat. § 624.155). Pursuant to § 624.155, any person may bring a civil action against an insurer when that person

---

**8.** "Chapters 624–632, 634, 635, 636, 641, 642, 648, and 651 constitute the 'Florida Insurance Code.'" Fla. Stat. § 624.01.

is damaged by the insurer's violation of certain enumerated provisions of the Code. *See* Fla. Stat. § 624.155(1)(a). While several subsections of § 626.9541 are among the enumerated provisions whose violation gives rise to a private right of action, § 626.9541(1)(a) is not.

With respect to the private right of action created by § 624.155, the Court also notes that that section includes an explicit statement that it "shall not be construed to authorize a class action suit against an authorized insurer ... or to create a cause of action when an authorized health insurer refuses to pay a claim for reimbursement on the ground ... that the service provided was not medically necessary." Fla. Stat. § 624.155(6).

While the Code does not provide a private right of action for misrepresentation by an insurer regarding the terms of an insurance policy, the civil remedies provided in the Code are not exclusive. With respect to the private right of action created by § 624.155, that "civil remedy ... does not preempt any other remedy or cause of action provided for pursuant to any other statute or pursuant to the common law of this state." *See* Fla. Stat. § 624.155(8). Similarly, the provisions of the FUITPA "are cumulative to rights under the general civil and common law, and no action of the department, commission, or office shall abrogate such rights to damages or other relief in any court." Fla. Stat. § 626.9631; *see also Keehn v. Carolina Cas. Ins. Co.,* 758 F.2d 1522, 1525 (11th Cir.1985) ("Considered as a whole, it appears that the [F]UITPA intended to provide an administrative remedy for violations thereof, and to leave intact those civil causes of action that were available to insureds prior to the enactment of the Act.").

### 4. Impairment of Florida's Insurance Laws

■ As an initial matter, the Court concludes that applying RICO would neither "invalidate" nor "supersede" Florida law, as there is no risk that doing so would render Florida law ineffective. At most, applying RICO in the instant case might permit Plaintiff to obtain relief otherwise unavailable to her under Florida law. The question then becomes whether this result would "impair" Florida law. In the absence of a private right of action under Florida insurance law, the unavailability of other state causes of action permitting Plaintiff to obtain the relief she seeks in this case, and the conflict between Plaintiff's claims and the requirements of Florida insurance law, the Court concludes that it would.

### a. Absence of Private Right of Action

Following the Supreme Court's ruling in *Forsyth,* courts have split on whether the absence under state insurance law of a private right of action based upon a particular claimed injury is dispositive as to whether the McCarran-Ferguson Act bars a civil suit under federal law based upon the same injury. *See Negrete,* 927 F.Supp.2d at 876–77 (citing cases and discussing split). As noted above, the *Forsyth* Court based its conclusion that applying RICO would not impair Nevada insurance law at least in part on the fact that Nevada law provided a private right of action for the alleged insurance fraud and misrepresentation on which the RICO claims were based. *See Forsyth,* 525 U.S. at 311–12, 119 S.Ct. 710. Florida law, however, does not provide a private right of action for the alleged misrepresentation on which Plaintiff's RICO claims are based. *See Joseph,* 612 Fed.Appx. at 557 (citing Fla. Stat. § 624.155). In the absence of guidance

from the Eleventh Circuit Court of Appeals, some courts faced with similar claims have concluded that the absence of a private right of action under Florida law is dispositive, and have dismissed RICO claims as barred under the McCarran-Ferguson Act, while others have concluded that this issue is not dispositive. *Compare, e.g., In re Managed Care Litigation*, 185 F.Supp.2d 1310, 1321–22 (S.D.Fla.2002) (finding absence of private right of action under Florida law dispositive and concluding that application of RICO would frustrate Florida law) *with Montoya v. PNC Bank, N.A.*, 94 F.Supp.3d 1293, (S.D.Fla. 2015) (noting that Nevada's private right of action "was but one of several factors" considered by the *Forsyth* Court and concluding that "the lack of a private right of action here is hardly dispositive").

The Court concludes that the absence under Florida insurance law of a private right of action for the alleged misrepresentation on which Plaintiff's RICO claims are based is not necessarily dispositive. As other courts have noted, the fact that Nevada insurance law provided a private right of action for the type of conduct on which the plaintiff's RICO claims were based was one among several reasons the *Forsyth* Court concluded that applying RICO would not impair Nevada insurance law. The Court also noted that Nevada insurance law did not exclude the application of other statutory and decisional state laws and that Nevada law provided for punitive damages comparable to and in some cases exceeding the treble damages available under RICO. *See Forsyth*, 525 U.S. at 311–13, 119 S.Ct. 710. In other words, the *Forsyth* Court also relied on the availability of other state causes of action and the similarity of potential remedies.

#### b. **Other Factors**

While the absence of a private right of action is not dispositive, the Court never-

theless concludes that applying RICO in the instant case would impair Florida insurance law. This conclusion rests largely on the fact that no other state statutory or common law claim available would permit Plaintiff to seek relief on behalf of a putative class for Defendant's alleged misrepresentations. The Court also notes that the allegations supporting Plaintiff's RICO claims are to some extent contradicted by Plaintiff's Policy and do not necessarily establish misrepresentation by Defendant, nor any other conduct prohibited by Florida insurance law. In fact, Plaintiff's RICO claims appear to challenge certain conduct required by Florida insurance law.

■ Like Nevada insurance law, Florida insurance law is not "hermetically sealed," as it does not preclude the pursuit of civil remedies available under other statutory or decisional state law. *See Forsyth*, 525 U.S. at 312, 119 S.Ct. 710; Fla. Stat. §§ 624.155(8), 626.9631. Of the civil remedies available outside of Florida insurance law, the Court sees no candidate more likely than a common law claim for fraud. *See Montoya*, 94 F.Supp.3d at 22 (citing Fla. Stat. § 768.72) (noting that plaintiff could bring a common law fraud claim challenging the conduct prohibited by Florida insurance law and could seek punitive damages in doing so). Such claims, however, may not be asserted on behalf of a class in Florida. "Under Florida law, claims rooted in fraud and deceit are based on separate contracts or transactions and are 'inherently diverse' because 'the demands of the various defrauded parties are not only legally distinct, but each depends upon its own facts.' " *Buell v. Direct General Ins. Agency, Inc.*, No. 8:06–cv–1791–T–26MSS, 2007 WL 1296347, at *2 (M.D.Fla. May 1, 2007) (quoting *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla.1984)).

Thus, "Florida law is clear that fraud claims are inappropriate for class treatment as a matter of law because of the individual questions presented." *Id.* (quoting *Hoechst Celanese Corp. v. Fry*, 753 So.2d 626, 627 (Fla.Dist.Ct.App.2000)); *see also* Fla. Stat. § 624.155(6) (noting that the civil remedy provided by § 624.155 "shall not be construed to authorize a class action suit against an authorized insurer"). Applying RICO in this case would therefore permit Plaintiff to seek relief otherwise unavailable under Florida law.

Furthermore, the Court questions whether the allegations contained in Plaintiff's Amended Complaint and the attachments thereto establish misrepresentation or any other violation of Florida insurance law. While the thrust of Plaintiff's RICO claims is the allegation that Defendant misrepresented the terms of Plaintiff's Policy and the reasons behind its coverage decisions, the Court notes that Plaintiff's Policy contains multiple references to Defendant's guidelines and to the incorporation of these guidelines in Defendant's coverage decisions. *See supra* at 3–6. It is therefore difficult to conceive how Defendant misrepresented or omitted the fact that it would rely on these guidelines, in addition to the definition of "Medically Necessary" set forth in the Policy, in making coverage decisions. To the extent Plaintiff alleges that Defendant misrepresented or omitted the fact that it would rely on considerations of cost in making coverage decisions, the Court notes that Plaintiff's Policy clearly discloses Plaintiff's use of "utilization management and utilization review programs." *See supra* at 6.

Finally, the Court notes that such "utilization management and utilization review programs" constitute one type of the cost-containment procedures and provisions *required* under Florida insurance law. *See* Fla. Stat. § 627.4234 (including "utilization review" among the list of cost-containment procedures and provisions required under Florida law in all health insurance policies). The fact that Plaintiff's RICO claims challenge the very cost-containment measures required under Florida insurance law weighs in favor of the conclusion that applying RICO in this case would impair Florida insurance law. *See Negrete*, 927 F.Supp.2d at 882 (citing *Managed Care*, 185 F.Supp.2d at 1339) (noting Florida's cost-containment requirement and concluding that "[t]his apparent conflict between the requirements of the state insurance regulatory scheme and the plaintiffs' claims in *Managed Care* support a much stronger inference of impairment").

## V. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Blue Cross and Blue Shield of Florida, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint [DE 27] is **GRANTED** and Plaintiff's Amended Complaint [DE 15] is **DISMISSED WITH PREJUDICE.**

2. The Clerk of Court is directed to **CLOSE THIS CASE.**

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 9th day of May, 2016.